**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DANNY DONOHUE, as President of the Civil Service Employees**
**Association, Inc., Local 1000, AFSCME, AFL-CIO, and CIVIL**
**SERVICE EMPLOYEES ASSOCIATION, INC., LOCAL 1000,**
**AFSCME, AFL-CIO,**

|  |  |
|---|---|
| **Plaintiffs,** | **Civil Action No.** |
|  | **10-CV-0543** |
| **-against-** | **(LEK)(DRH)** |

**DAVID A. PATERSON, as Governor of the State of New York, NEW**
**YORK STATE ASSEMBLY, NEW YORK STATE SENATE,**
**JONATHAN LIPPMAN, as Chief Judge of the New York Unified Court**
**System, and the STATE OF NEW YORK,**

**Defendants.**
_____

---

### *PLAINTIFFS DONOHUE'S AND CSEA'S*
### *MEMORANDUM OF LAW IN SUPPORT OF*
### *APPLICATION FOR PRELIMINARY INJUNCTION*

---

**NANCY E. HOFFMAN**
**Timothy Connick, of Counsel**
**Bar Roll #506163**
**Attorneys for Plaintiffs**
**Civil Service Employees Association, Inc.**
**Box 7125, Capitol Station**
**143 Washington Avenue**
**Albany, New York 12224**
**(518) 257-1443**
**tim.connick@cseainc.org**

**Timothy Connick,**
**Miguel Ortiz,**
**Paul S. Bamberger,**
**Ellen M. Mitchell,**
**Leslie C. Perrin,**
**Kara Hilburger,**
**Amanda J. Velazquez,**
   **On the Brief**

## <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT ...................................................................3

STATEMENT OF FACTS.............................................................................4

a.   Contracts.....................................................................................4

b.   Impairments ...............................................................................5

c.   Purported reasons for the impairments.....................................6

d.   Impact of impairments ..............................................................7

POINT I

    A PRELIMINARY INJUNCTION SHOULD BE ISSUED BECAUSE THE
    PLAIN FACTS SHOW THAT DEFENDANTS HAVE SUBSTANTIALLY
    IMPAIRED CSEA'S CONTRACTS FOR IMPROPER PURPOSES, AND
    SEVERE AND IRREPABLE HARM WILL RESULT...............................9

    1.   Irreparable harm exists here as defendants are unconstitutionally
        impairing plaintiffs' contracts and, further, the effects of the same are
        severe and irreversible.........................................................9

    2.   There is a likelihood of success because the contract impairments are
        substantial and not reasonable or necessary. ....................11

        (a)   The contract impairments are "substantial."..........12

        (b)   The means are not "reasonable and necessary." .................16

    3.   Plaintiffs also satisfy the serious questions standard..........20

POINT II

    PLAINTIFFS' REQUESTED TEMPORARY AND PRELIMINARY
    INJUNCTIVE RELIEF IS NARROW AND TAILORED SOLELY TO
    REMEDY THE UNCONSTITUTIONAL IMPAIRMENTS. ....................22

CONCLUSION ......................................................................................24

# PRELIMINARY STATEMENT

Plaintiffs DANNY DONOHUE, as President of the Civil Service Employees Association, Inc., Local 1000, AFSCME, AFL-CIO, and the CIVIL SERVICE EMPLOYEES ASSOCIATION, INC., LOCAL 1000, AFSCME, AFL-CIO (hereinafter "CSEA") bring this action for declaratory, injunctive and monetary relief because of defendants' unconstitutional impairment of CSEA contracts by:

      (a)     imposing a furlough with a resulting 20% reduction of the wages of tens of thousands of CSEA-represented State employees;

      (b)     failing to make financial contributions to the CSEA Employee Benefit Fund ("EBF"), such that the fund will shortly be insolvent with dental, vision and related health benefits thus ending for 208,000 CSEA-represented State employees and their dependants; and

      (c)     failing to pay, for an indefinite period of time, wage increases that were due on March 25, 2010 and April 1, 2010, to 68,300 CSEA-represented State employees.

By this application, CSEA seeks immediate injunctive relief, pursuant to F.R.C.P. Rule 65, to prevent this unconstitutional and irreparably harmful conduct from continuing until this matter is fully adjudicated.

More specifically, CSEA requests a temporary and preliminary injunction enjoining defendants from implementing any furloughs of CSEA bargaining unit members, and enjoining defendant DAVID A. PATERSON, as Governor of the State of New York, from submitting to defendants NEW YORK STATE ASSEMBLY and NEW YORK STATE SENATE any further "extender" appropriation bills that do not include appropriations in the amount and at the rates provided for in the collective bargaining agreements between the parties for the CSEA Employee

Benefit Fund and for the CSEA bargaining unit members at the applicable salary rates provided therein.

## STATEMENT OF FACTS

a.    **Contracts**

CSEA, a labor union, represents approximately 68,300 employees of the Executive Branch of the State of New York and approximately 6,200 members employed by the State of New York Unified Court System (hereinafter "UCS") (Hanna Affidavit ¶¶3, 7; Howard Affidavit ¶¶3, 5).

CSEA has negotiated multi-year collective bargaining agreements with defendants that provide for certain specific salary schedules for its bargaining unit members (Hanna Affidavit ¶¶5, 10-12, 19-20, Exhibits A, B).  The agreements also provide for certain payments to the CSEA EBF, which provides certain health and welfare benefits for CSEA unit employees and their dependants who work for the Executive Branch and UCS (Hanna Affidavit ¶33, Exhibits E, F).

As to the salary schedules, CSEA agreed in the negotiations leading to those agreements to various immediate concessions, such as increased basic medical deductibles and increases in co-pays for various medical treatments and, in exchange, the agreements were back-loaded so that the largest of the salary increases (4%) were to take effect April 1, 2010, the beginning of the State's fiscal year 2010-2011 (Hanna Affidavit ¶¶7-9, Exhibit A; Donohue Affidavit ¶¶13-14).

The benefits that EBF provides to CSEA-represented Executive Branch and UCS employees, their dependants, and some retirees, is funded solely by the defendants' payments as provided in the agreements (Hanna Affidavit ¶¶33-38, Exhibits H, G; Howard Affidavit ¶¶6-8). [1] The EBF provides dental, vision, and certain other health-related benefits (Howard Affidavit ¶¶11-12).  Approximately 208,000 persons (again, CSEA-represented employees, dependants and some

---

[1] The local government division of the EBF is funded solely by contractual payments from local governments and covers local government employees, not at issue here.

4

retirees) are covered by and receive benefits through the EBF (Howard Affidavit ¶7; Hanna Affidavit ¶38).

**b.    Impairments**

Commencing April 12, 2010, Governor Paterson began submitting to the Legislature, on a weekly basis, a series of "extender" one-week appropriation bills that did not include funding in the amount and at the rates provided in the collective bargaining agreements for the CSEA Employee Benefit Fund and for the salaries of CSEA-represented Executive Branch employees (Turner Affidavit ¶¶6, 8, 10, 13, 15, Exhibits B, C, D, G, I; Hanna Affidavit ¶40; Howard Affidavit ¶¶25-27).

The extender bills specifically excluded the required 4% raises for CSEA unit members in the Executive Branch that had been negotiated and specifically required by the agreements (Hanna Affidavit ¶¶13-15; Turner Affidavit ¶¶6, 8, 10, 13, 15, Exhibits B, C, D, G, I).  The extenders, however, have provided for the 4% raises for CSEA unit members employed by UCS (Turner Affidavit ¶9, Exhibits B, C, D, G, I).

The extenders provided no funding whatsoever for the EBF on behalf of either the State or UCS (Howard Affidavit ¶¶25-27; Hanna Affidavit ¶40).

Commencing May 7, 2010, Governor Paterson began submitting "extender" one-week appropriation bills that further provided for a one-day-a-week furlough of CSEA bargaining unit Executive Branch employees (Turner Affidavit ¶15, Exhibit I; Hanna Affidavit ¶¶21-23, Exhibit C).  Managerial and confidential (that is, non-unionized) employees, UCS employees, and legislative employees are not covered by the furloughs (Hanna Affidavit ¶¶21-22, Exhibit C; Donohue Affidavit ¶10; Turner Affidavit ¶15, Exhibit I).  Under the terms of the bill, employees

are prohibited from using their accrued paid leave to remain in paid status for the one day furlough (Hanna Affidavit ¶29; Turner Affidavit ¶15, Exhibit I).

Because of the legal budgetary framework in New York State, the Legislature cannot add appropriations to the governor's extender bills and, thus, faced with the Hobson's choice of completely closing down the State government or passing the unlawful temporary extenders, the Legislature has passed the extenders each week (Complaint ¶¶28-29).

### c.    Purported reasons for the impairments

Governor Paterson has repeatedly issued statements that the reason that he did not permit the financing of the 4% raise was specifically to pressure the Legislature into passing the budget (Turner Affidavit ¶¶5, 7, 11-12, Exhibits A, E, F).

Governor Paterson has also stated that he refused to adhere to the 4% raise to save money (Turner Affidavit ¶16, Exhibit J).  However, paradoxically, he also has said that the raise will be paid once the budget is enacted, putting into question just how this act would save money (Turner Affidavit ¶¶5, 7, Exhibit A).  The Governor has also provided for the financing of the 4% raise for CSEA unit employees working for UCS (Turner Affidavit ¶9, Exhibits B, C, D, G, I).

Regarding the non-payment of the EBF despite the plain contractual requirements, Governor Paterson has never specifically addressed the possible justification for that failure.

As to the furloughs, Governor Paterson has stated that he is taking that action, again, specifically to pressure the Legislature (Turner Affidavit ¶14, Exhibit H).

He, however, has also said he is implementing furloughs to pressure the labor unions (Turner Affidavit ¶¶27, 30-33, Exhibits K, P).  Indeed, the furlough bill expressly provides that if the unions agree to give-backs, the furlough will be cancelled (Turner Affidavit ¶15, Exhibit I).

He has further said he is forcing the furloughs to save money (Turner Affidavit ¶32, Exhibits N, P).  The amount saved, however, is miniscule compared to the amount of the reported budget shortfall; the budget gap is purportedly 9 billion dollars and the furloughs will supposedly save 30 million dollars a week (Turner Affidavit ¶¶16, 18; Exhibits F, K).  That amounts to *a third of one percent* of the Governor's estimate of the budget deficit (Turner Affidavit ¶20).  If the goal is to save money, no explanation has been offered as to why the furloughs do not cover managerial/confidential employees, UCS employees, or legislative employees (Turner Affidavit Exhibit I; Hanna Affidavit ¶22, Exhibit C; Donohue Affidavit ¶10).

In this regard, the New York State Senate specifically found, via resolution on May 10, 2010, that Governor Patterson's actions were unlawful and *not* reasonable or fiscally necessary (Connick Affidavit ¶4, Exhibit A).

**d.      Impact of impairments**

The Governor's proposed furlough of one-day-per-week for an indefinite period of time will diminish the actual salaries received by tens of thousands of employees covered under the agreements by at least 20% per week (Hanna Affidavit ¶¶25-28).  Furthermore, the Governor's prohibiting CSEA members from utilizing their contractually negotiated accruals on furlough days precludes the members from offsetting these substantial losses, and constitutes a further impairment of the agreements (Hanna Affidavit ¶¶29-30, Exhibit E).

The failure to fund the EBF will force the suspension of EBF benefits by July 1, 2010, and the EBF will suffer severe administrative and business losses (Howard Affidavit ¶¶28-30; Hanna Affidavit ¶¶40-42).  This will eliminate the bargained-for dental and vision coverage of 208,000 CSEA employees, their dependants and some retirees (Howard Affidavit ¶¶29-30; Hanna Affidavit ¶¶40-42).

The State's failure to pay the 4% salary increase creates an indefinite substantial monetary loss to approximately 68,300 CSEA employees (Hanna Affidavit ¶18).

CSEA represents the core of the State's workforce: workers on the lower end of the salary schedules who care for the elderly and infirm, clean offices, type documents, fix equipment, and so forth (Donohue Affidavit ¶8; Hanna Affidavit ¶16).  More than half of CSEA-represented State workers earn less than $45,000 per year, with over 14,000 members earning less than $30,000 annually (Hanna Affidavit ¶16).  The loss of a 4% increase in wages, calculates to a loss of $800 to $1800 per month (Hanna Affidavit, ¶¶16-18).

Collectively, the loss of 20% of their weekly salaries, the loss of the 4% pay increase, and the loss of certain of their health and welfare benefits, all unexpectedly and within a matter of weeks and for an indefinite period of time with no promise of reimbursement, constitutes a massive financial and personal hardship for CSEA members (Hanna Affidavit ¶¶43-46; Donohue Affidavit Exhibit A - Affidavits of Susan French, Shelby Powers, Arlene Balaban, Dawn Knowling, Stacy Rine, John Swiers, Joseph Visconti, Nanette Cherney, Lisa Thompson and George Jordan).

# POINT I

### A PRELIMINARY INJUNCTION SHOULD BE ISSUED BECAUSE THE PLAIN FACTS SHOW THAT DEFENDANTS HAVE SUBSTANTIALLY IMPAIRED CSEA'S CONTRACTS FOR IMPROPER PURPOSES, AND SEVERE AND IRREPABLE HARM WILL RESULT.

Defendants have robbed plaintiffs of the core benefits of their contracts, for unreasonable and improper purposes, with the result that 68,300 CSEA unit members will suffer serious financial loss and 208,000 CSEA unit members, retirees and dependants will lose dental and vision benefits. Clearly, a preliminary injunction is appropriate.

It has oft times been held that preliminary injunctive relief should be granted where plaintiff demonstrates: (1) irreparable harm; and (2) either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Limited*, 598 F.3d 30 (2d Cir. 2010); *Lynch v. City of New York*, 589 F.3d 94, (2d Cir. 2009); *City of New York v. Gold Feather Smoke Shop*, 597 F. 3d 115, 120 (2d Cir. 2004).

Plaintiffs meet each and every one of these prongs.

**1.     Irreparable harm exists here as defendants are unconstitutionally impairing plaintiffs' contracts and, further, the effects of the same are severe and irreversible.**

Defendants, as more fully discussed below, are unconstitutionally impairing plaintiffs' contracts.  It is well established that a constitutional deprivation, by itself, for even a minimal period of time, constitutes irreparable harm.  *Elrod v. Burns*, 427 U.S. 347, 373-375, 96 S.Ct. 2673 (1976).  "When an alleged deprivation of a constitutional right is involved, most courts hold that no

further showing of irreparable injury is necessary." *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) *citing what is now* 11 A. Federal Practice and Procedure, § 2948.1, n. 21(2d. Ed.).

Indeed, many courts state that a *presumption* of irreparable harm flows from a violation of constitutional rights. *Jolly v. Coughlin*, 76 F.3d 469, 482 (2d Cir. 1996)("The district court ... properly relied on the presumption of irreparable injury that flows from a violation of constitutional rights."); *see also, Charette v. Town of Oyster Bay*, 159 F.3d 745, 755 (2d Cir. 1998); *C & A Carbone, Inc. v. Town of Clarkstown*, 770 F.Supp. 848, 854 (S.D.N.Y. 1991).

Here, in addition to the deprivation of their constitutional rights, the harm faced by CSEA-represented employees is severe and irreversible.  Under the furloughs, tens of thousands of employees covered under the agreements will have their pay slashed by at least 20% per week for an indefinite period.  Further, defendants' failure to pay the 4% salary increase creates an additional, indefinite substantial monetary loss for approximately 68,300 persons.  More than half of CSEA-represented State workers earn less than $45,000 per year, with over 14,000 members earning less than $30,000 annually; the loss of a 4% increase in wages, calculates to a loss of $800 to $1800 per month.  These are significant sums to the persons involved.

In considering irreparability in the context of the State of New York's unlawful lagging of public employee pay, the Second Circuit stated as follows:

> The affected employees have surely relied on full paychecks for such essentials as food and housing.  Many have undoubtedly committed themselves to personal long-term obligations such as mortgages, credit cards, car payments, and like-obligations which might go unpaid in the months that the lag payroll has its immediate impact.  *Cf. Sniadach v. Family Finance Corp. of Bay View*, 395 U.S. 337, 342 n. 9, 89 S. Ct. 1820, 1823 n. 9, 23 L.Ed.2d 349 (1969) "'For a poor man *** to lose a part of his salary often means his family will go without the essentials. ***'") (quoting statement of Congressman Gonzales, 114 Cong. Rec. 1833).

*Association of Surrogates (Surrogates I),* 940 F.2d 766, 772 (2d Cir. 1991).

CSEA members will suffer not only financially; they, as well as their dependants and retirees will have certain health and welfare benefits yanked out from under them.  The failure to fund the EBF will force the suspension of benefits by July 1, 2010, and thus eliminate the dental and vision coverage of 208,000 persons.  It has understandably been held that the elimination of medical benefits, such as dental care, constitutes irreparable injury. *Communications Workers of Am., Dist. One, AFL-CIO v. NYNEX Corp.,* 898 F.2d 887 (2d Cir. 1990); *Whelan v. Colgan,* 602 F.2d 1060 (2d Cir. 1979).

Collectively, or singularly, the impact of this conduct will be dramatic.  The submitted affidavits of the individual CSEA members vividly portray the irreparable consequences to them and their families and infant children --- if defendants are not enjoined --- going without food and clothing, lack of medicine for sick family members, and fears of eviction, default, and foreclosure. These are things that cannot simply be "remedied" after the fact.

Clearly, plaintiffs have established irreparable harm.

**2.      There is a likelihood of success because the contract impairments are substantial and not reasonable or necessary.**

As for the second prong of the test to obtain preliminary injunctive relief, likelihood of success on the merits, plaintiffs most certainly demonstrate a meritorious claim for unconstitutional impairment of their contracts.

The Contract Clause of the United States Constitution, Article I, § 10, cl. 1, provides in relevant part:

> No State shall . . . pass any . . . Law impairing the Obligation
> of Contracts . . .

In *United States Trust Co. v. New Jersey*, 431 U.S. 1, 25-26 (1977), the U.S. Supreme Court set forth the test to establish a violation of the Contract Clause --- first, the impairment of the

contract must be "substantial" and, secondly, the impairment of the contract must be shown not to be "reasonable and necessary" for the State to achieve "an important public purpose." Here, the record shows that there is a "substantial" impairment of the compensation and benefits provisions of the contracts, and the impairment is not reasonable and necessary to accomplish an important public purpose.

    (a)    **The contract impairments are "substantial."**

Gutting the key elements of CSEA's contracts (i.e., pay, pay raises and benefits) clearly is a substantial impairment.

The Second Circuit has held that the substantiality of contract impairment may be determined by examining "the extent to which reasonable expectations under the contract have been disrupted." *Sanitation & Recycling Indus.*, 107 F.3d 985, 993 (2d Cir. 1997). In the context of a collective bargaining agreement, the Second Circuit has specifically noted "the levels at which union employees are to be compensated are *the most important elements* of a labor contract" and they are "the central provision upon which it can be said they reasonably rely." *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006) (*emphasis added*).

Upon information and belief, *every* federal and state court that has been confronted with the issue of the constitutionality of unpaid furloughs has held that furloughs are a "substantial" impairment of contract. In *Fraternal Order of Police v. Prince George's County*, 645 F.Supp.2d 492 (D. Md. 2009), for one example, a ten-day furlough over the course of a year, which was achieved by imposing one unpaid day every 2.5 weeks resulting in a 3.85% cut in salary, was held to be a substantial impairment of the union contract. Compare that to the situation here where an indefinite permanent 20% pay cut is being imposed, on top of denying pay raises of 4%.

In *Opinion of Justices (Furlough)*, 135 N.H. 625, 634 (1992), the court similarly held that a proposed furlough would constitute a substantial impairment.  There, the furlough plan was to require employees to take between three and six unpaid days off over a period of eighteen months, depending on employees' wage levels.

And in *Massachusetts Community College v. Commonwealth*, 420 Mass. 126 (1995), the court held that a mandatory furlough of State employees was a substantial impairment of the union contract where employees were required to take a minimum of two and a maximum of sixteen unpaid days off, depending on salary, over a six-week period prior to the end of the State's fiscal year.  The court found the furlough to be a substantial impairment even though the deprivation in salary was not even permanent as employee pay was to be restored either in the new fiscal year or upon separation from service.  *See, also, Baltimore Teachers Union v. Mayor of Baltimore,* 6 F.3d 1012, 1018 & n. 8 (4th Cir. 1993) (furlough of 2.5 days over a one-year period, equal to "only" .95% of salary, was substantial impairment).

In this regard it is significant to consider that the previous attempt by the State of New York to implement a lag payroll in the 1990s was struck down as a substantial impairment. *Association of Surrogates & Supreme Court Reporters v. State (Surrogates I)*, 940 F.2d 766, 774 (2d Cir. 1991); *Association of Surrogates v. State (Surrogates II)*, 79 N.Y.2d 39 (1992); *Condell v. Bress*, 983 F.2d 415 (2d Cir. 1993).  Since a lag, which is a *delay* in payment of employees' contractual salaries, is a substantial impairment, the furloughs imposed here, requiring that employees *permanently* lose one day's pay every week for an undefined number of weeks, is obviously an even "greater" impairment.

Indeed, the furlough of one day per week, with no ability to apply accruals to cover the day, constitutes a 20% reduction of employee wages.  This reduction will be permanent; employees will

never receive the lost pay.  Moreover, forcing employees to spend time off the payroll impacts

other contractual and legal benefits including, for example, service time for retirement and pension

purposes, and eligibility for Family Medical Leave Act coverage.  The furlough is clearly a

substantial impairment of the collective bargaining agreements.

As to not paying the raises, failure to pay a negotiated salary increase has repeatedly been

found to "substantially" impair union contracts.  In *Carlstrom v. State*, 103 Wash. 2d 391, 395

(1985) the court struck down the failure to pay a contractual salary increase, holding that the

State's action, "altered and diminished a valid and binding contract.  That repudiation impaired the

contract."  In *Sonoma County Organization of Public Employees v. City of Long Beach*, 23 Cal. 3d

296, 313 (1979), the court held that the failure of the City to pay a contractual cost of living

increase "substantially impaired" the contract.  The court reasoned,

> The anticipated wage increase during the second year [of the
> contract] may have affected the employees' wage demands for the
> first years of the contract, and undoubtedly many employees rendered
> their services in the first year in anticipation of their contractual right
> to the second year increase.

Moreover, in Florida, the state's highest court held that legislature's failure to pay the contractually

required 3% pay raises constituted a "substantial" impairment of the contract.  *Chiles v. United*

*Faculty of Florida*, 615 So.2d 671, 673 (1993).

Here, CSEA and defendants entered into collective bargaining agreements for a period of

four years, from April 1, 2007 through March 31, 2011.  These agreements were reached, in part,

due to CSEA's acceptance of "back-loaded" salary increases over the terms of the agreements,

calling for lower increases in the early years of the Agreements, and a higher increase in the final

year, fiscal year 2010-2011.  Notably, CSEA represents many State workers who are among the

lowest wage earners in the state workforce, the majority of whom earn less that $45,000 per year,

for whom the 4% increase represents a proportionately significant sum.  The omission of the 4% increase thus far in fiscal year 2010-2011 undeniably constitutes a substantial impairment of the terms of each of the four-year Agreements.

Finally, it perhaps goes without saying that health-related insurance and welfare benefits are extremely important elements of a collective bargaining agreement.  Thus, the failure to continue contractually negotiated premium payments or to fund benefit provisions has been found to be a "substantial" impairment.  *AFSCME v. City of Benton, Arkansas*, 513 F.3d 874 (8th Cir. 2008); *see, also, Baltimore Teachers Union*, 6 F.3d 1012 (4th Cir. 1993) (wherein the court noted that the loss of work days resulting from the furlough was designed not to impact eligibility for other benefits such as health insurance).

Defendants' failure to pay the EBF will result in the EBF going insolvent on or before July 1, 2010, with employees and their dependents who are engaged in ongoing treatment under the benefit plans forced either to pay out of pocket or forego treatment altogether.  In addition, care providers may withdraw from the program, permanently detracting from available benefits.  Here, again, it is undeniable that the failure to appropriate funds to make contributions to the EBF is a substantial impairment.

Each of the three actions by the State of New York at issue herein – the furloughs, the withholding of the 4% pay raises and the withholding of funds for the EBF – constitutes a "substantial" impairment of the CSEA/State contracts.  *Taken together*, there can be no doubt that these impairments meet the constitutional test for being "substantial."

**(b)       The means are not "reasonable and necessary."**

Governor Paterson is causing and intends to cause more of this havoc for wholly unreasonable and improper purposes.  His purposes change by the day; his "plan" is *ad hoc* and irrational.

If a governmental decision to impair a contract smacks of "political expediency" (*Surrogates I*, 940 F.2d at 773), or "self interest" (*Buffalo Teachers*, 464 F.3d at 365), the impairment must be struck down.  That is precisely what is happening here.

Governor Paterson's acts of freezing CSEA members' pay, refusing to pay the EBF, and now slashing of CSEA employee pay by furloughs are not part of some careful and measured plan, tailored to deal with New York State's financial problems.  Rather, the chain of events, his own statements, and the actual acts reflect that the Governor is using these devices, in a rather erratic and ham-handed way, for political purposes to pressure the State Legislature to adopt a budget, and/or bully the state public employee unions into giving up hard won contract rights.  While the negative impact on CSEA members is dramatic, the impact on the state budget is barely negligible.  Clearly, these means are not reasonable or necessary.

In terms of the appropriate review of the "reasonable and necessary" standard in the context of a governmental body attempting to impair its *own* contracts, the Supreme Court first cautioned in *United States Trust Co., supra,* 431 U.S. at 30-31, that complete deference should not be given as the governmental body may be tempted to act based on "self-interest" in violating its contracts.  *See, also, Allied Structural Steel Co v. Spannaus*, 438 U.S. 234 (1978); *Association of Surrogates & Supreme Court Reporters v. State (Surrogates I)*, 940 F.2d 766, 774 (2d Cir. 1991); *Condell v. Bress*, 983 F.2d 415 (2d Cir. 1993).

Excessive deference by the courts in such situations is inappropriate, the Supreme Court held, because it would give a State too much leeway to "find a use for extra money, especially when taxes do not have to be raised." *United States Trust Co., supra,* 431 U.S. at 30-31.  The Contract Clause "exists as a constitutional check on state legislation" for just this reason.  *Allied Structural Steel Co. v. Spannaus, supra*, 438 U.S. at 245.  As stated in *Prince George's County, supra,* 645 F.Supp. at 508, "the Framers of the Constitution drafted the Contract Clause based on the concern that state governments might enact legislation to alter, relax or unilaterally modify contractual obligations."

Thus, where a government body seeks to solve a budget shortfall by impairing its own contracts, the courts will not uphold the impairment unless the governmental action is "narrowly tailored" to meet specific budgetary needs, and "less drastic" alternatives were shown to be unavailable.  *Prince George's County, supra,* 645 F.Supp. at 511.

The Governor here has stated again and again that he is trying to pressure the Legislature into adopting a budget, and/or pressure CSEA into contract concessions.  Presumably, angry CSEA members are supposed to be calling State legislators or CSEA officers to complain about how they are being hurt by the lack of a budget.  In precisely similar circumstances, courts have held just such tactics unlawful.

In *Haley v. Pataki*, 883 F.Supp. 816, 825 (N.D.N.Y 1995), in a strikingly similar situation, Governor Pataki failed to include legislative salaries in a pay bill for the purpose of pressuring the Legislature into "quick passage of the state budget."  The court therein stated that the Governor's actions were an improper "backhanded method of getting disgruntled employees to coax their legislators into adopting Governor Pataki's budget proposals more quickly." *Id*., 883 F.Supp. at

825.  The court found this to be an improper purpose, not reasonable and necessary, and the failure to pay the salaries was thus held to be a violation of the Contract Clause.

Likewise, in *Prince George's County*, 645 F.Supp.2d 492, the court struck down a furlough plan as an unconstitutional contract impairment, because the County Executive had imposed the furlough on the County's unionized employees only after the unions rejected the County Executive's demand to give back negotiated raises during the term of the contract.  Again, the facts in *Prince George's County* are very close to the facts at-issue herein.  There, the Maryland District Court questioned the County Executive's reasons for imposing the furlough, stating, "The Court has reservations as to whether the County's fiscal crisis was the primary motivation for the furloughs," and implying that the County Executive imposed the furloughs as retribution for the unions' refusal to reopen their contracts and give back their raises.  *Id*. at 512.  The court concluded that the furlough scheme did not clearly serve an important public purpose and struck it down as unconstitutional.

For examples of narrow, tailored, measures that have been found reasonable and appropriate, *compare, Buffalo Teachers Federation v. Tobe*, 464 F.3d 362, 369 (2d Cir. 2006) (where the court said it was reasonable and necessary to impose temporary wage freeze as part of a careful overall plan and where alternatives had been exhausted) and *Subway-Surface Supervisors Assn.  v. New York City Transit Auth.*, 44 N.Y.2d 101 (1981) (where a temporary wage freeze was found to be proper where it was part of a careful structured effort to deal with a financial crisis and alternatives were considered but not feasible).  The Governor's actions here are clearly not carefully tailored to address the specific problem; rather, he is using the contract impairments for impermissible political purposes.

The details of the Governor's actions show that his decisions actually have nothing to do with really dealing with the budget crisis. The Governor projects the budget deficit to be $9.2 billion; the "savings" from the furloughs is *one third of one percent* of the deficit.  This is hardly a significant method to address the State's deficit.  And if the goal is to save money, why don't the furloughs cover the much more highly paid managerial/confidential employees?  Or UCS employees?  Or legislative employees?  The "plan" (if it could be called that) can hardly be called reasonable.

In fact, the very text of the furlough bill itself contains language which expressly shows that the Governor is using the furloughs as a hammer to force the unions into givebacks of hard won contract provisions.  The bill provides that the furloughs will be cancelled if the unions agree to certain unspecified cost savings.  In other words, the Governor is saying, "You have less than a week to surrender or your members will start suffering in a major way."  The improperness of the motive is captured in the very language of the bill.

As to the delay in the raises, if the goal is really to save money, what sense does it make that the Governor has said that the 4% raise will be paid once the budget is enacted?  How, then, is money saved?  And if there was any logic whatsoever to this scheme, why were the UCS CSEA unit employees paid their 4% raise?  And why isn't EBF being funded?  The Governor does not even have an explanation for that outrageous contract impairment.  UCS employees got their raise, but do not get their EBF funding.  It makes no sense.  The Governor is proceeding in a totally irrational, ad hoc fashion, that is wrecking real damage.

In this regard, it is noteworthy that the New York State Senate specifically declared, via resolution on May 10, 2010, that Governor Patterson's actions are unlawful and *not* reasonable or fiscally necessary (Connick Affidavit ¶4, Exhibit A).

As stated in *Opinion of Justices (Furlough), supra*, 135 N.H. at 634 (1992), "the State cannot resort to contract violations to solve its fiscal problems." *Id*. The Second Circuit in *Surrogates I, supra,* 940 F.2d at 774, applied the same reasoning when it held that, although the alternatives to impairing contracts may not be "popular among politician-legislatures, [] that is precisely the reason that the contract clause exists."

The Governor's flailing political maneuvers are clearly not reasonable and necessary, as the courts have defined this standard, to justify his flagrant violation of the CSEA contracts.

**3.     Plaintiffs also satisfy the serious questions standard.**

While it is respectfully submitted that plaintiffs have more than adequately established a likelihood of success on the merits, plaintiffs also satisfy the "serious questions" standard because the hardships decidedly tip in their favor if a preliminary injunction is not issued. *Citigroup Global Markets*, *supra* at 35 (holding that the 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claim, but where the costs outweigh the benefits of not granting an injunction); *Norlin Corp. v. Rooney, Pace Inc.,* 744 F.2d 255, 260 (2d Cir. 1984); *Sperry Intern. Trade, Inc. v. Government of Israel*, 670 F.2d 8, 11 (1982); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc*., 596 F. 2d 70, 72 (2d Cir. 1979); *Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 758 (2d Cir. 1979).

At a very minimum, plaintiffs submit that the facts are more than enough to show that there are serious questions raised about whether the actions of the Governor and State Legislature substantially impair the compensation and benefits provisions of the CSEA contracts and that said impairments are not reasonable and necessary to accomplish an important public purpose. As the Second Circuit held in *Citigroup Global*, "The very purpose of an injunction… is to give

temporary relief based on a preliminary estimate of the strength of plaintiff's suit, prior to the resolution at trial of the factual disputes and difficulties presented by the case." 598 F.3d at 35-36.

Here, the harm CSEA members will suffer if an injunction is not issued is far greater than any injury defendants will suffer if the preliminary injunction is issued.  On the one side are blatant violations of the Constitution's Contract Clause and the welfare of literally tens of thousands of State employees.  On the other side are moneys that are an extremely tiny fraction of any budget shortfall, which will have virtually no impact on the State's budget situation.  Of course, the State's overall economy is not aided by reducing the salaries that State workers will spend on meeting the needs of themselves and their families.  Clearly, the equities here tip in favor of the employees and their families.

Contract rights are not inviolate only in good economic times but are intended to be preserved in hard times as well.  "If governments could reduce their financial obligations whenever an important public purpose could be conceived for repudiating a contract, 'the Contract Clause would provide no protection at all.'" *Opinion of the Justices*, *supra* at 1211, *quoting Carlstrom v. State*, *supra* at 396, *supra* and *United State Trust Co., supra*.

Under the circumstances, a preliminary injunction is wholly appropriate under all the applicable standards.

## POINT II

### PLAINTIFFS' REQUESTED TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF IS NARROW AND TAILORED SOLELY TO REMEDY THE UNCONSTITUTIONAL IMPAIRMENTS.

To the extent that this Court is reluctant to become involved in the budget battles of New York State Government, it is respectfully submitted that plaintiffs' requested temporary and preliminary relief is narrow, reasonably tailored and specific to remedy the unconstitutional impairments herein and, thus, wholly appropriate and necessary.

Plaintiffs herein seek an injunction against the suddenly imposed furloughs and, further, a directive to the Governor that he henceforth submit lawful extender bills that comply with the State's contractual and legal obligations to CSEA.  Plaintiffs do not otherwise seek to place this Court in the morass of New York State politics.  There is specific authority in the U.S. Northern District for just this type of relief under these circumstances.

Although a suit against a state official in his or her official capacity may be barred by the Eleventh Amendment regardless of the relief sought, it is well-recognized that an exception applies when an action challenges the constitutionality of a state official's action.  *Frew v. Hawkins*, 540 U.S. 431, 437 (2004).  In such an action, "prospective injunctive relief as well as measures ancillary to appropriate prospective relief" are not barred by the Eleventh Amendment.  *Id.*

Thus, in *Haley v. Pataki*, 883 F.Supp. 816, 821 (N.D.N.Y. 1995), where an action was brought challenging the constitutionality of Governor Pataki's failure to submit an extender bill appropriating money for the salaries of legislative employees, the court therein held that while it could not order the Governor to appropriate funds to pay legislative employees as part of a preliminary injunction, it could, and did, order "that insofar as the Governor undertakes to send

future appropriation bills and messages of necessity to the legislature for the payment of state workers, he may not exclude payment to legislative employees from such bills, and a portion of these same funds must be allocated for the payment of legislative employees." *Id.*, at 828.

Consistently, plaintiffs herein merely seek the eminently reasonable injunctive relief of voiding the yet-to-be-imposed illegal furloughs and a direction to the Governor that his new extender bills be lawful and constitutional.

# CONCLUSION

By reason of the foregoing, it is respectfully requested that plaintiffs' application for a temporary and preliminary injunction be granted; that defendants be enjoined from implementing any furloughs of CSEA bargaining unit members; that defendant DAVID A. PATERSON, as Governor of the State of New York, be enjoined from submitting to defendants NEW YORK STATE ASSEMBLY and NEW YORK STATE SENATE any further "extender" appropriation bills that do not include appropriations in the amount and at the rates provided in the collective bargaining agreements between the parties for the CSEA Employee Benefit Fund and for the CSEA bargaining unit members at the applicable salary rates provided therein; and the Court grant such other and further relief as deemed just and proper.

Dated: May 10, 2010
      Albany, New York

                      Respectfully submitted,

                      NANCY E. HOFFMAN

                      */s Timothy Connick*

By:             _____

                      Timothy Connick, of counsel
                      Bar Roll No. 506163
                      143 Washington Avenue
                      Albany, New York 12224
                      Tel.: (518) 257-1443
                      Fax: (518) 449-1525
                      tim.connick@cseainc.org

Timothy Connick,
Miguel Ortiz,
Paul S. Bamberger,
Ellen M. Mitchell,
Leslie C. Perrin,
Kara Hilburger,
Amanda J. Velazquez,
    On the Brief

PL/10-0645/TC/ks/MOL/#145015