UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

KENNETH BRYNIEN, as PRESIDENT of the NEW YORK STATE PUBLIC EMPLOYEES
FEDERATION, AFL-CIO,

*Plaintiffs,*                                                                                  10-CV-00544

                                 -against-                                                (LEK)(DRH)

DAVID A. PATERSON, as GOVERNOR of the STATE OF NEW YORK, et al.,
*Defendants.*
_____

DANNY DONOHUE, as President of the Civil Service Employees Association, Inc., Local
1000, AFSCME, AFL-CIO, et al.,

*Plaintiffs,*
                                                                                                  10-CV-00543

                                 -against-
                                                                                                  (LEK)(DRH)

DAVID A. PATERSON, as Governor of the State of New York, et al.,
*Defendants.*
_____

PHILLIP H. SMITH, as President of UNITED UNIVERSITY PROFESSIONS, et al.,
*Plaintiffs,*

                                 -against-
                                                                                                  10-CV-0546

HONORABLE DAVID A. PATERSON, as Governor of the State of New York, et al.,
*Defendants.*                                                                             (LEK)(DRH)
_____

BARBARA BOWEN, as President of PROFESSIONAL STAFF
CONGRESS/CUNY, et al.
*Plaintiffs*,
                                                                                                  10-CV-00549

                                 -against-

                                                                                                  (LEK)(DRH)

THE STATE OF NEW YORK, et al.
*Defendants.*
_____

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
## MOTION FOR PRELIMINARY INJUNCTION


                                                  ANDREW M. CUOMO
                                                  Attorney General of the State of New York
                                                  Attorney for Defendants

Jeffrey Dvorin
Assistant Attorney General, of Counsel
Bar Roll No. 101559
On the Brief:  Stephen M. Kerwin
                       Kelly Munkwitz
                       Aaron Baldwin
                       Justin Levin
Assistant Attorneys General
Telephone:  (518) 473-7614
Fax:  (518) 473-1572 (Not for service of papers)                    Date: May 19, 2010

**Table of Contents**

Preliminary Statement....................................................................................................1

FACTS...................................................................................... .......................2

    Collective Bargaining Agreements.......................................... .....................5

    New York's Revenue Crisis.....................................................................6

    Remedial Measures............................................................................7

    New York's Cash Flow Crisis and The State's Response...........................7

    2010-2011 Executive Budget..................................................................8

    Workforce Savings..............................................................................9

    Emergency Appropriation Bills..............................................................9

    The Employee Benefit Fund.................................................................10

    The Furlough Proposal.......................................................................11

    Plaintiffs' Savings Proposals......................................... .................13


ARGUMENT

    Standard of Review...........................................................................13

    POINT I
          PLAINTIFFS ARE NOT LIKELY TO PREVAIL ON THE MERITS
          ON THEIR CONTRACT IMPAIRMENT CLAIMS..................................16

            1. Plaintiffs Cannot Demonstrate A Likelihood of
               Success on Their Claims Under Article 1 § 10
               of the United States Constitution ("Impairment
               of Contracts clause) ......................................................16

               A. Substantial Impairment.. ..........................................17

               B. Legitimate Public Purpose...........................................19

               C. Reasonable and Necessary Means.................................21

i.  State did not consider furloughs on a
        par with other alternatives............................................22

ii.  No moderate or less drastic impairment............................23

iii.  Reasonableness in light of the circumstances...................26

iv.  The Senate's Resolution....................................................31

D.  The Cases Relied Upon By the Plaintiffs
        Are Not Controlling................................................................32


POINT II
        PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE INJURY.................34

1.  Furloughs....................................................................................36

2. Delayed Salary Increase Payments..............................................36

3.  Benefits Freeze..........................................................................37

4.  No Presumption of Irreparable harm Based on Alleged
        Constitutional Violation.....................................................38

5.  The Balance of Hardships Do Not Tip In Plaintiffs' Favor And
        The Public Interest Would Be Disserved By An Injunction...............40


POINT III
        ABSENT A FINAL JUDGMENT OF A CONSTITUTIONAL
        VIOLATION, THIS COURT IS WITHOUT JURISDICTION
        TO GRANT THE SALARY INCREASES REQUESTED BY
        THE PLAINTIFFS IN THEIR MOTIONS FOR INTERIM
        INJUNCTIVE RELIEF...............................................................41


CONCLUSION...........................................................................................42

**Preliminary Statement**

The State of New York is in the midst of the most serious and sustained economic downturn since the Great Depression.  The issues before the Court center on two steps among a series of extraordinary actions both the Governor and the Legislature have taken to ensure the continued provision of government services and to avoid the chaos and widespread harm that will inevitably ensue if the cash balance falls close to zero.  First, emergency appropriation bills passed in the absence of an enacted budget for FY 2010-11 delayed application of the four percent pay increase plaintiffs contend is due under their collective bargaining agreements. Second, Chapter 75 of the Laws of 2010 - the sixth of seven emergency appropriations enacted since March 29, 2010 -   includes a provision for a furlough without pay for certain State employees reducing hours worked by twenty per cent during the week covered by the emergency appropriation.

Guided by his responsibility to safeguard the interests of all New Yorkers, the Governor proposed, and the Legislature passed, a measure intended to generate some savings from one of the largest categories of  State operations expenditures:  personnel costs. As with other cost-savings measures enacted in this historic time, Chapter 75 was met with immediate opposition from those directly affected by the spending cut.  Plaintiffs - primarily collective bargaining agents for some of the affected State employees - commenced these actions on May 10-12, 2010 with the filing of  Summonses and Complaints.

Simultaneous with their legal action, the plaintiffs seek the extraordinary remedy of a preliminary injunction which would require the defendants to cease and desist from implementing the scheduled furloughs and require defendants to pay salary increases.  Some plaintiffs also seek to enjoin the defendants from delaying payment into a contract-benefit fund.

Some plaintiffs further seek to keep the Governor from proposing any further "budget extender" bills that do not contain appropriations for benefits and salary increases to their members.   All four applications for interim relief are based solely upon the alleged likelihood of success of the parallel claims under Article 1 § 10 of the United States Constitution ("impairment-of-contracts" clause).  Plaintiffs, however, cannot demonstrate a likelihood of success because the State has acted reasonably and necessarily to protect the public, and the equities of all the citizens outweigh those of the plaintiffs.  There are no simple answers to the State's financial woes, but difficult decisions must be made by the Governor and the Legislature.[1]

In short, defendants oppose the applications which,  by design or effect,  will significantly hinder the efforts of the Governor and the Legislature to steady the State's precarious financial position.  As the State's chief executive, the Governor must have the discretion  to responsibly manage cash on a continuous basis and to remediate the daunting budget deficits forecast for future years.  The defendants ask this Court to preserve the Governor's vital power commensurate with his constitutional responsibility, to deny the plaintiffs' motion for injunctive relief, and to dismiss these lawsuits.

## FACTS

The unprecedented shortage of revenue available to provide vital government services and critical operations  has produced a cash crisis. At various times over the past year the State has been at significant risk that it would run out of cash during the month if all payments were made as planned.  The consequences of State actually running out of cash would be chaotic and potentially devastating. Megna Aff'd, ¶ 7.

---

[1]  Defendants New York State Assembly and New York State Senate in the Donohue action (10-CV-0543) oppose the application for a preliminary injunction exclusively on the grounds that they are not proper parties and anticipate being dismissed from this litigation.

The cash crisis first manifested itself in December 2009.  At one point during that month, it was estimated that the General Fund (the main operating fund of the State) would be in deficit by $1.4 billion if all payments due were made. Megna Aff'd, ¶ 8.  At that time, Governor Paterson directed that his Budget Director  delay payments of school aid in order to ensure that the State had sufficient moneys on hand to allow New York to meet all its other obligations.  Although those payments were eventually made after it was determined that there was sufficient cash on hand to do so, the withholding was challenged in a law suit, *Becker v. Paterson*, that is still pending.  Id.  In March 2010, a second round of school aid payments was delayed, again, in order  to ensure that the State had sufficient cash on hand to meet its obligations and otherwise avoid chaos.  Megna Aff'd, ¶ 9. That measure, too, was met with litigation also captioned *Becker v. Paterson*.

The Governor's budget proposal, submitted in January 2010 pursuant to Article VII of the New York State Constitution and New York State Finance Law, is, four months later, pending before the Legislature, and the State has been forced to continue its provision of services without an enacted budget.  Megna Aff'd, ¶ 10.  The State has been able to continue operating with the Governor's introduction of week-to-week emergency appropriation bills which limit expenditures wherever possible, by (among other means):  (a) providing agencies with minimum appropriations necessary to continue operations; (b) not appropriating funds for certain construction contracts; and (c) delaying other payments provided for by contract, such as the premiums for the New York State Health Insurance Program.  Id.  Once again these decisions - in particular the absence of any appropriation to fund some construction contracts - have produced litigation or threats of it.  Id. Moreover, and more pertinent to this litigation, since the start of the 2010-2011 FY, the State did not provide the 4% salary increase provided for in various collective bargaining agreements with the State employee bargaining agents in the first six emergency appropriation bills enacted in the

current fiscal year.[2]  Id.   In the absence of the enactment of a State budget, the need to finance the State's essential expenditures via weekly appropriations has exacerbated the fiscal crisis.  Id.

Since the emergency appropriation bills have been an inadequate mechanism to enact a comprehensive budget plan, and because the State entered the current fiscal year with a significant projected deficit, New York is continuously facing the potential exhaustion of its available cash, coupled with a long term and growing fiscal deficit.  Megna Aff'd, ¶ 11.  Absent an enacted budget that provides for both spending controls and revenue cuts, the State has been compelled to seek yet another delay of school aid payments so that it will not run out of money on June 1, when its delayed school aid payments come due. Megna Aff'd, ¶ 12.  In light of this situation, the State has been compelled repeatedly to look for further savings wherever they may be obtained, to ensure adequate cash flow to maintain state operations without imperiling the State's finances in the long term.  Id.  The choices as to whether  to withhold particular expenditures arise from a week-by-week assessment of the State's cash position;  the timing of which particular payments come due; the impact from delaying a particular expenditure;  and the impact of withholding on the State's long-term fiscal picture.  In short, it is a process that requires daily executive discretion.  Id.

The pending Executive Budget proposal includes savings from the State's workforce, one of the largest categories of expenditures for government operations.   Those savings were unspecified, to allow for negotiations with the collective bargaining representatives of public employees to determine the best way to achieve this outcome.  Efforts to achieve the workforce savings called for in the budget have been thus far unsuccessful, as the collective bargaining representatives of State employees have declined to agree to any reductions in expenditures for current State employees.  Megna Aff'd, ¶ 13.

---

[2]   The pay increase was provided for in the seventh such appropriation, in compliance with the temporary retraining order issued by this Court on May 12.

For these reasons, and after curtailing numerous crucial State expenditures, and taking extraordinary measures to obtain funds from other sources, the Governor proposed in his Sixth Emergency Appropriation bill, and the Legislature enacted, a provision to allow for a twenty per cent reduction in work scheduled for  most State employees, with exceptions for employees providing direct care, essential for health and safety, who are funded entirely with federal funds, and who serve in management/confidential positions.  As set forth below, this proposal, coupled with numerous other cost-savings measures, is necessary to address the State's current cash and fiscal crises in an equitable and orderly manner.  Megna Aff'd, ¶ 14.

**Collective Bargaining Agreements ("CBAs")**

When the State enters into a collective bargaining agreement with its employees' bargaining agents, certain terms and conditions of the agreements are enacted into  law in the form of "paybills."  Megna Aff'd, ¶ 43.  The State's agreement with CSEA, the largest employee union served as a template for the agreements then reached with the other unions.  Id.

The latest agreements were first negotiated in 2007 and were predicated upon optimistic forecasts as to the State's and the nation's  fiscal health.  Megna Aff'd, ¶ 44-46.  The State agreed to multi-year contracts with it is unions running from April 1, 2007 to March 31, 2011 and providing for a series of pay increases, the last of which was to be effective April 1, 2010.  Megna Aff'd, ¶ 47.  All of the CSEA agreements provide:  "It is agreed by and between the parties that any provision of this agreement requiring legislative action to permit its implementation by amendment of law or by providing the additional funds therefore, shall not become effective until the appropriate legislative body has given approval."  Megna Aff'd, ¶ 49.  The State's  agreement with PEF included similar raises and legislative-approval  provision.  Megna Aff'd, ¶ 54.  The paybills for both the CSEA and PEF agreements contained the following provision:  "Notwithstanding any of the foregoing

provisions of this section, any increase in compensation may be withheld in whole or in part from any employee to whom the provisions of this section are applicable when, in the opinion of the director of the budget and the director of employee relations, such increase is not warranted or is not appropriate."  Megna Aff'd, ¶¶ 52 and 55.  The annual pay increases provided by the various CBAs are one component of the salary increase received by the covered employees over the life of the agreements.  In addition to the negotiated increases in the agreements, employees also received location pay, step increases, longevity bonuses, and other enhancements that can,  in some instances,  give rise to an annual pay increase of seven per cent for particular employees in FY 2010-11.  Megna Aff'd, ¶ 61.

**New York's Revenue Crisis**

By March 17, 2008 the positive fiscal forecasts for the State made the previous year had begun to evaporate.  The week before, Bear Stearns collapsed in astonishing fashion, losing 90 percent of its value in just two days.  In the days that followed, AIG was faced with sudden insolvency.  Then Lehman Brothers failed, as did many commercial banks.  Extraordinary actions by the United States Department of Treasury and Federal Reserve became necessary to preserve the nation's financial system.  The economic slow down precipitated by the mortgage and housing crisis became known as the "Great Recession" and, as Governor Paterson observed, New York was its epicenter.  Megna Aff'd, ¶ 62.

These events had, and continue to have, a profound impact on the revenue base for New York State's program of expenditures and delivery of services.  Over the past 15 years, the New York City financial district has provided at least 20 percent of New York's tax base.  Yet the Wall Street enterprises from which such taxes are paid were hardest hit by the crisis, and revenues from that sector were more severely constricted than in any period in recent history, including the

aftermath of the 9/11 attacks and the bursting of the Internet bubble.   Megna Aff'd, ¶ 64. Throughout 2008 and the winter of 2009, New York State's revenues declined precipitously.  Prior to the enactment of the FY 2009-10 budget, the Governor directed various administrative actions. In addition the State adopted a Deficit Reduction Plan for FY 2008-09.  Megna Aff'd, ¶ 65.  The State continued, despite this step, to face a deteriorating fiscal situation.

**Remedial Measures**

In response to this bleak and worsening picture,  the Governor has taken a series of steps in an attempt to shore up the State's fiscal position, including at least twenty measures intended to reduce non-personnel services costs in the State's agencies.  Megna Aff'd, ¶¶ 45-60.  He directed State agencies to reduce non-personnel services by 11% across-the-board, resulting in a $1.5 billion reduction in State agency  expenses since enactment of the FY 2008-9 budget.  Megna Aff'd, ¶ 74. In addition, on October 15, 2009, the Governor proposed a Deficit Reduction Plan ("DRP") consisting of a number of legislative and administrative actions that would have reduced the FY 2009-10 projected cash deficit by $3.2 billion in FY 2009-10, with recurring savings in later years. Megna Aff'd, ¶ 75.   On December 1, 2009, the Legislature passed some of the legislative components of the DRP and the Governor signed them into law.  See: L.2009, ch. 501, 502 and 503.  Megna Aff'd, ¶ 76.   This, together with the administrative actions, reduced the FY 2009-10 projected deficit by approximately $2.7 billion.  Id.

**New York's Cash Flow Crisis  and The State's Response**

The State's cash weakness significantly worsened in December 2009.  Megna Aff'd, ¶ 33. December is historically a month when the State's cash on hand is relatively low, because substantial payments for local aid, School Aid and Medicaid are made at that time, and the State has yet to receive what can be, depending on the year, a key revenue item:  income tax paid on financial

sector bonuses. Id.  The Budget Director concluded that there was a significant risk the State would run out of sufficient available funds necessary to make its December payments, and he delayed such payments until the State had sufficient cash to ensure that they could be made. Megna Aff'd, ¶ 34. Facing a similar dilemma in March, he delayed another set of payments totaling $2.06 billion until June.  Megna Aff'd, ¶ 38.  Without these unprecedented measures – both of which have been challenged by law suits – the State would likely have depleted its available cash in FY 2009-2010. Id.

The one group that did not experience the affects of these cuts was the State's unionized workforce.  With respect to  the non-unionized work force, however,  the Governor withheld all M/C pay raises for 2009-10, as well as longevity bonuses and merit awards, and their 4% overall increase in 2010-11, for a total savings of $86.6 million.   Megna Aff'd, ¶ 77.

**2010-11 Executive Budget**

The Governor's proposed Executive Budget for FY 2010-11, including supplemental recommendations, eliminated a budget gap estimated at $8.5 billion. Megna Aff'd, ¶ 78.  The budgetary gap will increase in future years, absent action to restore fiscal balance.  Megna Aff'd, ¶ 79.  Without spending restraint, the State's credit rating may be downgraded.  Id.  To close this gap, the Executive Budget proposed significant cuts, including nearly $1 billion in health care reductions, over $1.5 billion cuts in school aid, and  a $325 million reduction in local aid. Megna Aff'd, ¶ 80. On the revenue side, the budget reflected significant increases in the cigarette tax and the imposition of a tax on sugary drinks.  The budget also reflected significant additional income tax revenues as a result of the income tax surcharge added in the enacted FY 2009-10 budget.  Id. Since the proposed budget was announced, the State's revenue position has deteriorated further, and

on April 27 the Governor proposed $620 million in additional cuts and revenue measures to keep the plan in balance.  Megna Aff'd, ¶ 83.

**Workforce Savings**

The Governor's Executive budget included $250 million for unspecified General Fund savings.  Megna Aff'd, ¶ 81.  The specific process for achieving such savings was to allow unions representing the State workforce to negotiate personnel savings on the basis of mutual agreement, so that the State could close its revenue shortfall.  While various efforts  were made to reach out to these collective bargaining agents, the latter made clear at an early stage that they would agree to no savings whatsoever that would impact their members.   Id.

The Senate and Assembly have not agreed on a budget resolution, with each house passing its own version differing from the other's and from the Governor's proposal by several billion dollars.  Megna Aff'd, ¶ 71. As a result, nearly two months into  FY 2010-11, the State had no budget in place. Megna Aff'd, ¶ 82.

**Emergency Appropriation Bills**

In the absence of a budget, the Governor has submitted seven emergency appropriation bills to date which have appropriated funds to authorize essential expenditures such as  payroll, unemployment insurance, pharmaceutical coverage and veterans' benefits. Megna Aff'd, ¶ 84.  In short, these bills have provided for bare bones expenditures, solely as necessary to keep the State functioning.  Id.  The initial emergency appropriation bill prohibited  the payment of any amounts for general salary increases for members of CSEA, PEF and other employee organizations who are not parties to this instant actions.  Megna Aff'd, ¶ 85.  The exclusion of general salary increases continued through May 17, 2010 when the exclusion was removed  from the latest "budget extender" pursuant to this Court's Order of May 12, 2010.  Id.

Despite the constrained nature of these interim budgets and the cost savings thereby achieved, the State continues to face a looming cash crisis. Megna Aff'd, ¶ 89.   Moreover, a significant number of payments come due in June and, as a result, the State faces the prospect that it will run dangerously low on  available funds next month, when a significant school aid payment of $2.06 billion comes due on June 1. Megna Aff'd, ¶ 90.   A proposed bill to delay school aid until June 30 was not enacted this week.  Id. As a result, the State is seeking to use all appropriate measures to limit the State's expenditures. The furlough at issue in this litigation is one such measure.  Megna Aff'd, ¶ 81.  Notwithstanding, it is the intention of the Governor to pay the raises called for by the CBAs, retroactively to April 1, 2010, once a budget is enacted for 2010-11. Megna Aff'd, ¶ 86.

**The Employee Benefit Fund**

The CSEA CBAs provide for the continuance of the Employee Benefit Fund ("EBF") to provide health and welfare benefits, including but not limited to dental care and vision care, to CSEA-represented employees.   Megna Aff'd, ¶ 108.  Pursuant to the CSEA Agreements,  the State is to deposit in the EBF  approximately $17.4 million beginning April 1, 2010 and thereafter. The CSEA Agreements specify that "such amounts must be deposited as soon as practicable after the first day of each quarter."  Megna Aff'd, ¶ 110.   The amount to be deposited relative to the State Judicial Unit is $9.2 million.  Put simply, the State's current lack of cash makes such deposits wholly impractical.  Megna Aff'd, ¶ 111.

In its affidavit, CSEA represents that, because the State has not made this deposit, the EBF  funds will be exhausted on July 1, 2010.  It presumes, in such filings, that (a) no payments will be made by that date; and (b) that the temporary withholding of payments will – contrary to the

State's own experience – result in the immediate cessation of benefits.  It presents no evidence for either of these points.  Megna Aff'd, ¶ 110.

Similar to numerous other payments, the State has been forced by the current crisis to manage its cash in regard to the EBF – delaying payments until necessary to preserve benefits.  No harm has come to any employee as a result of such delays, nor have plaintiffs pointed to any reason why this problem  cannot be remedied until it is necessary to do so.  Megna Aff'd, ¶ 90.

**The Furlough Proposal**

Prior to FY 2010-11 numerous efforts to address the State's cash shortfall and fiscal gap were made without any reduction in funding for current unionized employees.  While Governor Paterson proposed a wage freeze in the budget for FY 2009-10, he indicated that this would only occur pursuant to a negotiated agreement. When both CSEA and PEF stated explicitly that they would agree to no changes in their contracts, the proposal was not enacted.  Megna Aff'd, ¶ 92.

The Governor initially obtained workforce savings solely by eliminating salary increases for management/confidential employees.  See supra, page 8.

The absence of any permanent personnel savings from the majority of the State's work force in the face of both the immediate cash crisis, and the multi-year long term structural imbalance in the State's finances, has become increasingly untenable.  In the past year and a half, the State has:

(1) increased State income taxes by over $4 billion annually;

(2) delayed school aid payments of over $2 billion;

(3) withheld M/C pay increases totaling $86.6 million;

(4) withheld payments to insurers;

(5) withheld payments to contractors;

(6) cut $1.5 billion from state agencies; and

(7) closed budget gaps well in excess of $20 billion, even though gaps continue to emerge.

In the absence of an enacted budget, the State still faces both an imminent shortfall, and longer term structural deficit.   Even with the enactment of such budget, it confronts out-year deficits of extraordinary scope.   Under these circumstances, the inclusion of additional personnel savings is essential.  Megna Aff'd, ¶ 95.

For these reasons, the Sixth Emergency Appropriation bill (GPB # 250) contained a proposal for a single day's furlough for most State employees.  This proposal would have  resulted in savings of about $30 million, and could be repeated in subsequent emergency appropriation bills for further savings.   Megna Aff'd, ¶ 95.  The legislation provides an escape hatch from the furlough, if an agreement can be reached with the collective bargaining representative of the employees at issue to provide for "comparable personal service savings."  In this way, alternative means of achieving the same goal are permitted, to provide flexibility.  Further, the Governor has publicly stated that he will not seek to impose the furlough for more than an eight week period. Megna Aff'd, ¶ 97.  Absent a negotiated outcome, a furlough is the optimal savings mechanism for the State, since it results in permanent savings which address the State's long-term fiscal shortfall, rather than (as is the case in a pay lag) borrowing from employees with a future obligation to repay, and thus producing a negative overall fiscal impact..  Megna Aff'd, ¶ 98.

The consequences of the State simply exhausting its cash at any time would be dire. Such a scenario poses a very real risk that expenditures planned for the immediate future would be made in a chaotic and random fashion or not at all.  Obligations would go unmet, subjecting the State to legal liability or a downgrading of its credit rating.  In the case of school and local aid,

some localities and districts would receive payment in full while others might get nothing, depending on the happenstance of when the particular payments were to be processed. Megna Aff'd, ¶ 98. It is in this context that the plaintiffs seek to enjoin and restrain an important element of the defendants' efforts to preserve the State's solvency.

**Plaintiffs' Savings Proposals**

Plaintiff Kenneth Brynien contends that the steps taken to reduce workforce expenditures are unnecessary because sufficient savings can be achieved through other alternatives. The proposals he advances, however, would not accomplish this goal. In several instances they would involve the investment of additional funds that the State does not possess, in the unproven hope that down the road further, savings will materialize. But the claimed savings are essentially a chimera. Megna Aff'd ¶s 99-105.

## ARGUMENT

**Standard of Review.**

Injunctive relief "is an extraordinary and drastic remedy which should not be routinely granted." Med. Soc'y of New York v. Toia, 560 F.2d 535, 538 (2d Cir.1977); Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh, 934 F.2d 30, 33 (2d Cir.1991). It should be granted sparingly since it is "one of the most drastic tools in the arsenal of judicial remedies." Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007).

Historically, a movant must show (a) irreparable harm should the relief not be granted and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the party seeking such relief. Lusk v. Village of Cold Spring, 475 F.3d 480, 485 (2d Cir. 2007); D.D. ex rel. V.D. v. New York City Bd. of Educ., 465 F.3d 503, 510 (2d Cir.2006).

13

However, pursuant to the Supreme Court's most recent pronouncement of the correct standard to be applied in injunction cases:

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

Salinger v. Colting, __ F.3d__, *14, 2010 WL 1729126 (2d Cir. April 30, 2010) quoting eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006). Although Salinger addressed the preliminary injunction standard in the context of copyright infringement, the Second Circuit opined that this standard is to be applied "for injunctions in any context." Id., at *15, n. 7.

The Court in Salinger emphasized that "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Salinger, __ F.3d__, *17 quoting Winter v. National Resources Defense Counsel, Inc., 129 S.Ct. 365, 376-77 (2008). Indeed, the eBay and Salinger decisions make clear that a fourth prong should be added to the three-part historical test  for granting a preliminary injunction one requiring courts to give due consideration and "particular regard for the public consequences in employing the extraordinary remedy of injunction." Salinger, at *817-18; Winter, 129 S.Ct. at 376-77.

Moreover, the fair-ground-for-litigation prong may not be considered "where the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme." N.A.A.C.P., Inc. v. Town of East Haven,  70 F.3d 219, 223 (2d. Cir. 1995) (citing Plaza Health Lab., Inc. v. Perales, 878 F.2d 577, 580 (2d Cir.1989);  see also Monserrate v. New York State Senate, 599 F.3d 148, 154 (2d Cir. 2010). The moving party in such a case

must establish, to the satisfaction of the district court, both irreparable injury and a likelihood of success on the merits. Id.  Further, the moving party must make a "clear" or "substantial" showing of a likelihood of success where (1) the injunction sought "will alter, rather than maintain, the status quo" *i.e.,* is properly characterized as a "mandatory" rather than "prohibitory" injunction; or (2) the injunction sought "will provide the movant with substantially all the relief sought, and that relief cannot be undone even if the defendant prevails at a trial on the merits." Jolly v. Coughlin, 76 F.3d 468, 473 (2d Cir.1996), citing, Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 33-34 (2d Cir.1995).  In this case, the interim relief sought by the plaintiffs is virtually identical to the ultimate relief they seek in these matters. Thus, the plaintiffs are required to make a clear or substantial showing of the likelihood of their success on the merits.

Plaintiffs have limited the basis upon which they seek injunctive relief, relying exclusively on their claims that the defendants have violated Article 1 § 10 of the United States Constitution ("impairment of contracts" clause).   In so choosing, the plaintiffs have not met their burden of demonstrating a likelihood of success on the merits on the other claims asserted in the four Complaints, and injunctive relief may not be granted to them based on the likelihood of success on those claims.[3]

---

[3] These forsaken claims include:  (1) deprivation of property without due process in violation of the Fourteenth Amendment and Article I, section 6 of the New York Constitution (Brynien, Smith and Bowen Complaints); (2) violation of Article 1, section 17 of the New York Constitution (Brynien);  (3) violation of sections 80 and 80-a of the New York Civil Service Law (Brynien); (4) denial of equal protection under the federal and state Constitutions (Smith and Bowen).

**POINT I**

**PLAINTIFFS ARE NOT LIKELY TO PREVAIL ON THE MERITS ON THEIR
CONTRACT IMPAIRMENT CLAIMS**.

"The requirement of showing a likelihood of success . . . should be seen as a protection

against the exercise of the court's formidable equity power in cases where the moving party's

position, no matter how emotionally compelling, is without legal foundation." See Tucker v.

Toia, 54 A.D.2d 322, 326 (4th Dept. 1976).  This admonition is especially apt here, where the

plaintiffs seek preliminarily what amounts to the ultimate relief sought by this action.

Plaintiffs fail to meet their burden of demonstrating a strong likelihood of success on the merits

of this action.

**1.  Plaintiffs Cannot Demonstrate A Likelihood of Success on Their Claims Under
Article 1 § 10 of the United States Constitution ("Impairment of Contracts" clause)**

The Contracts Clause of the United States Constitution provides that "[n]o State shall . . .

pass any . . . law impairing the Obligation of Contracts."  U.S. Const. Art. I, § 10.  "Although

facially absolute, the Contracts Clause's prohibition 'is not the Draconian provision that its words

might seem to imply.'"  Buffalo Teachers Federation v. Tobe, 464 F.3d 362, 367 (2d Cir. 2006),

cert. denied, 550 U.S. 918 (2007), quoting, Allied Structural Steel Co. v. Spannaus, 438 U.S.

234, 240 (1978).   Rather, the Contracts Clause must be read in conjunction with a State's

inherent authority to safeguard the interests of its citizens.   Id. at 367-68; accord Energy

Reserves Group, Inc. v. Kansas Power and Light Co., 459 U.S. 400, 410 (1983).  As stated by

the Second Circuit Court of Appeals, the Contracts Clause "does not trump the police power of a

state to protect the general welfare of its citizens, a power which is 'paramount to any rights

under contracts between individuals.'" Id. at 367, quoting, Allied Structural Steel Co., 438 U.S. at 241.

"[A] finding that there has been a technical impairment is merely a preliminary step in resolving the more difficult question whether that impairment is permitted under the Constitution." U.S. Trust Co. of New York v. New Jersey, 431 U.S. 1, 21 (1977). A Contract Clause violation may not be found if a law "serves a legitimate public purpose such as remedying a general social or economic problem" and "the means chosen to accomplish this purpose [are] reasonable and necessary." Buffalo Teachers Federation, 464 F.3d at 368; accord Energy Reserves Group, Inc., 459 U.S. at 433-13. Because the record demonstrates that the furlough and the temporary withholding of the four percent raise serves a legitimate state purpose and because the means chosen are both reasonable and necessary, plaintiffs' motion for preliminary relief must be denied.[4]

A.    Substantial Impairment

The first factor to consider is whether there is a substantial contractual impairment. Buffalo Teachers Federation, 464 F.3d at 368. Defendants dispute that the delayed payment of the 4% raise is a substantial contract impairment.

In considering whether an impairment to contract is substantial, courts consider the expectations of the parties with respect to changes in the law. Chrysler Corp. v. Kolosso Auto Sales, Inc., 148 F.3d 892, 894 (7th Cir.1998). Particularly relevant to this inquiry is whether the subject matter of the contracts had been subject to regulation at the time the contracts were made.

---

[4] Plaintiff Brynien also contends that the furlough is a violation of a memorandum of understanding in regards to layoffs. Even assuming that the memorandum was at all applicable and binding, a one-day (or eight-day) temporary furlough simply does not constitute a layoff. The statutes governing layoffs, Civil Service Law §§ 80 and 80-a concern the "abolition and reduction" of positions. See Gettinger vv. Putnam/Northern Westchester Board of Cooperative Educational Services, 552 N.Y.S.2d 141 (2d Dept. 1990); see also Civil Service Law §§ 80 and 80-a (provision governing layoffs triggered by positions being "abolished or reduced in rank or salary grade, suspension or demotion").

Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 410 (1983).   A "regulation that restricts a party to gains it reasonably expected from the contract does not necessarily constitute substantial impairment."   Id.   Courts also analyze what terms of the contract are affected and the duration of the effects.   Cf. Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 245-47, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978) (describing example of a severe impairment of contractual rights).   Notably, a public employee's expectations must differ somewhat from those in the private sector.   As noted by the Court of Appeals for the Fourth Circuit:

> Public employees - federal or state- by definition serve the public and their expectations are necessarily defined, at least in part, by the public interest.  It should not be wholly unexpected, therefore, that public servants might well be called upon to sacrifice first when the public interests demand sacrifice.

Baltimore Teachers Union v. Mayor and Council of Baltimore, 6 F.3d 1012, 1021 (4th Cir. 1993).

The severity of the impairment measures the height of the hurdle the State legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation.  Allied Structural Steel Corp, supra, at 244-245.

The legislation at issue here does not, in fact, constitute a substantial impairment of the collective bargaining agreement with respect to the April 1, 2010 four percent salary increase. Covered employees will receive the agreed to raise effective April 1, 2010.  Chapter 75 of the Laws of 2010 simply affects the timing of payments, which will be temporarily delayed until a budget is enacted.  At that time the increase will be authorized, and employees will receive in due course checks that retroactively  account for the April 1st effective date.  Moreover, even

during the period during which  the increase is withheld, unionized employees are receiving the pay they received prior to April 1, along with any merit, performance and longevity awards.

### B.      Legitimate Public Purpose

Even where a state law substantially impairs contract rights, the law will not be considered to violate the Contracts Clause if a valid public purpose exists.  Energy Reserves Group, Inc., 459 U.S. at 411-12; accord Buffalo Teachers Federation, 464 F.3d at 368; Sanitation and Recycling Indus., Inc. v. City of New York, 107 F.3d 985, 993 (2d Cir. 1997).  "A legitimate public purpose is one 'aimed at remedying an important general social or economic problem rather than providing a benefit to special interests.'"  Buffalo Teachers Federation, 464 F.3d at 368, quoting, Sanitation and Recycling Indus., Inc., 107 F.3d at 993.  The "legitimate purpose" requirement is to ensure that the state is exercising its police power and not "providing a benefit to special interests."  Energy Reserves Group, Inc., 459 U.S. at 412; Sanitation and Recycling Indus., Inc., 107 F.3d at 993.  Both federal and state courts have held that a state's interest in addressing a fiscal emergency is a legitimate public interest.  See, e.g., id.; Subway-Surface Supervisors Assn. v. New York City Tr. Auth., 44 N.Y.2d 101, 110 (1978);  see also Order of the Hon. Lawrence E. Kahn dated May 12, 2010, at page 8, quoting, Buffalo Teachers Federation, 464 F.3d at 369.

There is no dispute that New York State is in the midst of a severe economic downturn, which has resulted in an unprecedented revenue and cash crisis.  Megna Aff'd, ¶ 5.  The collapse of Bear Stearns, AIG and Lehman Brothers, and the mortgage and housing crisis have had and continue to have a profound impact on New York State's revenue base.  Megna Aff'd, ¶¶ 62-64.  From April to November 2009, revenues from Personal Income Tax declined by 17.5 percent.  Megna Aff'd, ¶ 72.  During the same period, the amount of sales and use taxes collected declined

by approximately seven percent.  Megna Aff'd, ¶ 73.  Stated simply, New York State is not merely facing a significant deficit - absent withholding of payments, it would be  in dire danger of running out of cash next month, and has been compelled - and will continue to be compelled - to withhold certain payments in order to avoid that eventuality.  Megna Aff'd, ¶¶ 5, 7, 8, 90.

The consequences of the State simply running out of cash would be disastrous. Expenditures planned for the immediate future may be made in a chaotic and random fashion or not at all.  Megna Aff'd, ¶ 36.  Obligations would go unmet, subjecting the State to legal liability or downgrading of its credit rating.  Id.  In the case of school and local aid, some localities and districts would receive payment in full while others might get nothing, depending on the happenstance of when the particular payments were to be processed.  Id.  Thus, the State has been compelled to undertake a host of measures - not limited to the steps now at issue - to avoid this eventuality.

Neither the furlough contained in the Sixth Emergency Appropriation bill nor the temporary withholding of the four percent raise "provid[e] a benefit to special interests."  Energy Reserves Group, Inc., 459 U.S. at 412; Sanitation and Recycling Indus., Inc., 107 F.3d at 993. This step follows a series of actions affecting both public and private interests.  All areas of expenditure have to be examined to determine if savings can be realized.  For example, M/C employees have been denied both "step raises" and cost of living increases (Megna Aff'd, ¶ 77); school districts have seen aid temporarily withheld in both December and March (Megna Aff'd, ¶¶ 33-38); a moratorium was imposed on overtime (Megna Aff'd, ¶ 74; spending for local assistance programs has been cut by 12.5 percent (Megna Aff'd, ¶ 76); and State agencies have been compelled to trim their non-personnel budgets by 11 percent (Megna Aff'd, ¶ 74).  The

appropriation bills in question here are plainly to benefit the State as a whole and not special interests.

### C.   Reasonable and Necessary Means

Once a state demonstrates that a law serves a legitimate public interest, it must then establish that the means chosen were both reasonable and necessary.   Buffalo Teachers Federation, 464 F.3d at 369; Subway-Surface Supervisors Assn., 44 N.Y.2d at 109.   In determining reasonableness, a court must give some deference to a legislative determination. Buffalo Teachers Federation, 464 F.3d at 369; Subway-Surface Supervisors Assn., 44 N.Y.2d at 112; Baltimore Teachers Union v. Mayor and City Council of Baltimore, 6 F.3d at 1012.  Where a state impairs its own obligation, a higher standard of reasonableness and necessity is imposed. Although a court should not afford the "complete deference" applicable to laws that concern private contracts, it also should not "reexamine all of the factors underlying the legislation at issue and [] make a de novo determination whether another alternative would have constituted a better statutory solution to a given problem."  Id. at 370.  As noted by the Second Circuit Court of Appeals, "[s]uch a high level of judicial scrutiny of the legislature's actions would harken a dangerous return to the days of Lochner v. New York,  . . . in which courts would act as superlegislatures, overturning laws as unconstitutional when they 'believe[d] the legislature [] acted unwisely.'"  Id. at 371 (internal quotations omitted) (alterations in original), quoting Ferguson v. Skrupa, 372 U.S. 726, 730 (1963).

Rather than engage in a de novo review and potentially impose its own vision over that of the state officials, federal courts determine whether

> "the state did not (1) 'consider impairing the . . . contracts on par
> with other policy alternatives' or (2) 'impose a drastic impairment
> when an evident and more moderate course would serve its

> purpose equally well, nor (3) act unreasonably 'in light of the
> surrounding circumstances.'"

Id. at 371, quoting U.S. Trust Co., 431 U.S. at 30-31.


### i.      The State did not consider furloughs or withholding of pay increases on a par with other alternatives

Here, it is clear that the State enacted furloughs, and temporarily withheld unionized employees pay increases, only after considering and implementing alternatives that failed to stem the spiraling fiscal crisis.  In April 2008 when the fiscal crisis began, the State instituted hiring freezes that are in place to this day.  Megna Aff'd, ¶ 66.  In 2009, all State agencies were directed to reduce their non-personnel services by 11 percent.  Megna Aff'd, ¶ 74.  Beginning in 2009, M/C employees have been denied cost-of-living increases.[5]  Megna Aff'd, ¶ 77.  Also in 2009, a portion of the school district aid was delayed, pending sufficient cash to make the payments.  Megna Aff'd, ¶¶ 33-37.  School aid due to districts in March 2010 has been withheld.  Megna Aff'd, ¶ 38.  Member item spending has been reduced by $50 million.  Megna Aff'd, ¶ 68.  Health care was cut by $330 million.  Megna Aff'd, ¶ 68.  Payments to insurers and contractors has been withheld.  Megna Aff'd, ¶ 95.  Funds for construction have not been appropriated.  Megna Aff'd, ¶ 8.  Plainly, impairment of the union contracts are not on par with policy alternatives - only after the State exercised many other options did it resort to this action so as to stem an undeniable fiscal crisis.

Finally, the language inserted into collective bargaining agreements pursuant to Civil Service Law § 204-a states that any provision of the agreement that requires legislative action to permit its implementation, whether by amending existing law or by appropriating funds for such purpose, does not take effect until approved by the Legislature.  Here, the PEF and CSEA

---

[5] Union employees were not denied "step" increases for either FY 2009-10 or 2010-11.

paybills approved by the Legislature include a section providing that, "Notwithstanding any of the foregoing provisions of this section, any increase in compensation may be withheld in whole or in part from any employee to whom the provision of this section are applicable when, in the opinion of the director of the budget and the director of employee relations, such increase is not warranted or is not appropriate." The inclusion of such language in the legislative approval of the agreement at issue  means that such approval was expressly conditioned upon the ability of the Budget Director and the Director of Employee Relations to withhold pay increases when they are not appropriate. The exercise of this authority therefore doe not operate as an impairment of the contracts.

### ii.      No moderate or less drastic impairment

Plaintiffs argue that the furlough and the delay in payment of the 4% wage increases are not necessary because the State instead could have raised taxes, issued bonds, or cut other programs. Brynien MOL at 18-19; Bowen MOL at 11-12. But "it is always the case that to meet a fiscal emergency taxes conceivably may be raised. It cannot be the case, however, that a legislature's only response to a fiscal emergency is to raise taxes." Buffalo Teachers Federation, 463 F.3d at 372. As noted by the Second Circuit, it is not up to the courts to "second-guess the wisdom of picking" one alternative over another, "especially those that appear more Draconian, such as further layoffs or elimination of essential services." Id.

In an attempt to close the significant budget deficit, the Governor proposed in his Executive budget nearly $1 billion in health care reductions, over $1.5 billion cuts in school aid and a $325 million reduction in local aid. Megna Aff'd, ¶ 80.   The proposed cuts in the Executive budget follow the various and numerous other measures, discussed above, that the Governor took to maintain cash flow and curtail the fiscal crises. See, e.g., Megna Aff'd, ¶¶ 33-

38, 66, 68, 77, 95. Simply stated, the Governor has attempted various measures that affect various entities and individuals in an effort to close a significant budget gap and ensure that the State has cash.  Indeed, PEF has sought to obstruct such cost-saving measures, going so far as filing an improper practice charge to the State's effort to limit travel expenses on the ground that it is a departure from past practice.  Megna Aff'd, ¶74.

Because the State's fiscal health is so drastically different than it was in 2007, when the first of these collective bargaining agreements was agreed upon, the Governor's proposal also calls for a $250 million in unspecified workforce savings.  Megna Aff'd. ¶ 13.  Nonetheless, plaintiff unions have refused to negotiate with the Governor to implement the workforce cuts.  Megna Aff'd, ¶ 78.  Rather, they proposed other alternatives that they allege will save money.  See, e.g., Brynien Aff'd, ¶¶ 31-32.  However, such alternatives have already been implemented or do not address the State's immediate fiscal needs.  First, plaintiffs assert that the defendants failed to allow employees the opportunity to use the Voluntary Reduction in Work Schedule (VRWS).  Contrary to plaintiffs' claim, the executive has repeatedly directed agencies to make use of VRWS where appropriate.   Megna Aff'd, ¶ 106.  The Director of State Operations has issued two separate memoranda to this effect and Budget Bulletin D-1124, issued July 22, 2009, gave the same directive.  The Division estimates that $5 million to $10 million in All Funds savings was achieved through this program in FY 2009-10.  Such savings, however, are not separately indicated in the budget but are reflected in each agency's individual budget.  Id.

Plaintiffs also assert that the necessary savings could be realized by instituting a Consultant Reduction plan.  Brynien Aff'd, ¶ 32.  This assertion ignores the fact that the Governor has already taken steps to significantly decrease the State's dependence on independent contractors.   Megna Aff'd, ¶ 103.   In legislation enacted in 2009, which was prepared

cooperatively with PEF, the State has undertaken the major initiative of "in-sourcing" IT savings. Id. However, the savings achieved are a small fraction of those suggested by PEF. Id. Notably, the purported savings asserted by PEF are based upon numerous flawed assumptions, including that contractors work the same 37.5 hours worked by State employees and that they get paid for the entire length of the contract, rather than simply for time worked. Megna Aff'd, ¶¶ 103-104. While the State has made significant efforts in reducing its reliance on contractors, it has found no evidence to support the extraordinary savings claims PEF proffers. Megna Aff'd, ¶ 104.

Plaintiffs also assert that the Governor could reduce overtime costs by hiring entry-level state employees. Brynien Aff'd, ¶ 32. There is no evidence, however, that new employees hired will have the appropriate experience to handle tasks now being addressed by overtime performed by more experienced workers. Megna Aff'd, ¶ 105. Indeed, hiring more employees will have a negative cost impact on the State. Id. Plaintiffs fail to specify how new hires will achieve sufficient savings to offset the costs. In any case, the State has now issued a directive to limit overtime to essential instances. Id.

Plaintiffs further suggest that the State could implement a Workforce Injury Reduction Program that will cut injuries by 20 percent and save $45 million in direct and indirect costs. Brynien Aff'd, ¶ 105. While reducing injuries in the workplace is a worthy goal, such a program will not extricate the State from its immediate cash deficiency. Megna Aff'd, ¶ 105. PEF does not specify the nature of the program, the amount of time it will take to become operational, and how it derives the 20% savings from a suggestion that - once again - will require an additional investment of yet more funds before any of the purported savings will be realized. See Shattenkirk v. Finnerty, 97 A.D.2d 51 (3d Dept. 1983), aff'd 62 N.Y.2d 949 (1984) (similar legislative delegation to Budget Director allowing withholding of M/C salaries was "directly

related to the fiscal well-being of the State . . . [and] only part of a State policy to reduce  the over-all cost of government").

In sum, defendants have instituted numerous measures to address the fiscal crisis and imminent loss of cash flow.  Unfortunately,  these efforts have not been enough.  In order to alleviate the current fiscal and cash crisis, measures must be taken on all fronts - including reduction in workforce spending.  Megna Aff'd, ¶ 81.  Absent the more Draconian measure of instituting lay-offs or cutting essential services or even letting the State shut down, there are no reasonable alternatives to the Sixth Emergency Appropriations Bill.

### iii.      Reasonableness in light of the circumstances

The reasonableness of the Appropriation Bills is illustrated by the holdings in a Second Circuit Court of Appeals case, a Fourth Circuit Court of Appeals case and a New York State Court of Appeals case.  See Buffalo Teachers Federation v. Tobe, 464 F.3d 362, 367 (2d Cir. 2006), cert. denied, 550 U.S. 918 (2007); Baltimore Teachers Union v. Mayor and City Council of Baltimore, 6 F.3d 1012, 1019 (4th Cir. 1993); Subway-Surface Supervisors Assn. v. New York City Tr. Auth., 44 N.Y.2d 101, 110 (1978).  Similar to the facts currently before the Court, each of these  cases upheld a state action that impaired contracts in response to an unprecedented fiscal crisis.

In Buffalo Teachers Federation, the Second Circuit considered a wage freeze that was implemented by the Buffalo Fiscal Stability Authority (hereinafter "BFSA").  464 F.3d at 365.  The BFSA was legislatively created on July 3, 2003 to address the City of Buffalo's declining financial health.  Id. at 365-66.  Under the enabling statute, the BFSA was authorized to freeze future wage increases if it determined that the City of Buffalo was in fiscal crisis.  Id. at 365.  In its efforts to address the City of Buffalo's fiscal health, the BFSA directed the City to institute a

hiring freeze and to exclude from the plan wage increases that were not contractually required. Id. at 366.  Additionally, it approved two years of tax increases.  Id.  Notwithstanding the efforts to stabilize the City of Buffalo's fiscal situation, the projected budget gap continued to grow.  Id. Consequently, the BFSA declared a fiscal crisis and implemented an immediate wage freeze.  Id. at 367.  As here, the unions representing City employees brought suit.

The Second Circuit in Buffalo Teachers Federation found the City of Buffalo was suffering a fiscal crisis.  Id. at 368.  As such, the wage freeze served a legitimate public purpose. Id.  In upholding the wage freeze as reasonable and necessary, the Court made several finding. First, it found that the wage freeze was a last resort measure, instituted only after other measures had failed.  Id. at 371.  Second, it found that because the wage freeze was both temporary and prospective in nature, it was reasonable.  Id. at 371-72.  Finally, it noted that while there may have been other alternatives, many, such as lay-offs and the elimination of essential services, those alternatives were more Draconian than the wage freeze.  Id. at 372   Under such circumstances, it declined to second-guess the Legislature.  Id.

Similar to Buffalo Teachers Federation, the Court in Subway-Surface Supervisors Assn. v. New York City Transit Auth. concerned a city in fiscal crisis.   The Subway-Surface Supervisors Association entered into a collective bargaining agreement with the New York City Transit Authority, pursuant to which the Authority was obligated to provide specific wage increases between October 1, 1974 and September 30, 1976.  44 N.Y.2d at 107.  However, the wage increases were barred in August 1975, when the State Legislature enacted the New York State Financial Emergency Act for the City of New York (hereinafter "Act").  Id.  Under the Act, the Legislature found that the City of New York was in a financial emergency and was in danger of not being able to meet its obligations to holders of outstanding securities.  Id.  To stem the

disasters that could befall the City, the Act suspended increases in salaries, wages and shift differentials from September 1, 1975 to September 1, 1976, unless the emergency abated before that day or unless the Emergency Financial Control Board determined that a later date was necessary.  Id.

The Court of Appeals, like the Second Circuit in Buffalo Teachers Federation, found that the wage freeze constituted a "legitimate public purpose" based upon the fiscal crisis suffered by the City of New York.  Id. at 110.  Its holding that the wage freeze was reasonable was based upon the prospective nature of the impairment.  Id. at 112-13.  It specifically found that the legislation at issue

> effected a limited intrusion on the contract rights petitioner had secured for the employees represented by it under the collective bargaining agreement; there was neither termination of existing employment nor deprivation of payment for services that had been rendered in the past.  The effect was substantially less than what would have occurred had the statute withheld or reduced payment for services or consideration already performed or delivered -- as for instance, by impairing the right to payment of suppliers who had delivered goods, contractors who had erected structures or bondholders who had advanced funds, all creditors who had fully performed their obligations under contracts with the city or with covered organizations.

Id. at 113.  The Court noted that the collective bargaining agreement was still executory in nature because the services at issue had not passed from the employees.  Id.  As such, the employees had the option of withholding their services, depart the City's employ and offer their services elsewhere.  Id.

In Baltimore Teachers Union, the City of Baltimore was faced with a cut of approximately $24.2 million in state aid.  6 F.3d at 1014.  In response, it instituted lay-offs, eliminated positions and implemented early retirements.  Id.   However, two months later, the state announced a new round of cuts in state aid, that included approximately $13.3 million for

28

the City of Baltimore.  Id.  In response, the City instituted a "so-called furlough plan," under which full-time city employees lost the annual equivalent of 2.5 days of pay.  Id.  The furlough plan was cut midstream because Maryland's Legislature only approved $4.68 million of the cuts proposed.  Id.  Seeking restitution, the teachers and police brought suit.  Id.

The Court of Appeals for the Fourth Circuit upheld the furloughs.  It noted that the furloughs were implemented in response to a  sudden cut in state aid to a city "already suffering from the sluggish economy and poor financial management."  Id. at 1020.  It further held that the City's "obvious reluctance" to institute the furloughs, demonstrated by the fact that it first took measures such as job abolishments, layoffs and early retirement, belied the "political expediency" suspected in Association of Surrogates v. State of New York, 940 F.2d 766 (2d Cir. 1991).  Id.  Finally, it found that the plan was no greater than that necessary to meet the anticipated shortfall and that it was discontinued when it was realized the budget shortfall was not as great as that initially anticipated.  Id.

Unlike the cities in Baltimore Teachers Union , Buffalo Teachers Federation, or Subway-Surface Supervisors Association, New York State does not merely suffer from a budget shortfall or fiscal crisis.  The State is it is in danger of running out of cash by next month.  Megna Aff'd, ¶ 90.  As such, the public need at issue here is significantly more acute than that found in other cases in which impairment of contract was upheld by the courts.  Moreover, as in Buffalo Teachers Federation, and Subway-Surface Supervisors Association, the legislation at issue here is prospective in nature.  464 F.3d at 365; 44 N.Y.2d at 112-13.  Employees are not being deprived of compensation for services already provided.  Conversely, should the State run out of cash, vendors and contractors who have already provided goods and services to the State are in danger of not being paid.  See Megna Aff'd, ¶¶ 36, 90.  As such, the impact on employees is

significantly less than that to those who have already performed their contractual obligations. Subway-Surface Supervisors Assn., 44 N.Y.2d at 113.

Notably, the reductions found in the Appropriation Bills are no greater than that necessary to meet the current financial need. While a budget has not been passed, the Governor's Executive budget includes a proposal for $250 million in workforce savings for FY 2010-11. Megna Aff'd, ¶ 81. It was anticipated that the workforce savings would be negotiated with the unions representing the State workforce. Id. However, the collective bargaining agents made clear that they would agree to no savings that would impact their members. Megna Aff'd, ¶ 87. Consequently, in his efforts to reduce the State deficit and ensure the State's cash flow, the Governor was left with few choices but to take steps to implement the workforce savings. Significantly, the furloughs authorized in the Sixth Emergency Appropriation Bill are not without alternatives; the Bill provides that there would be no furloughs if the collective bargaining representatives of the employees at issue provide a method to achieve "comparable personal service savings." Megna Aff'd, ¶ 97. Because the Appropriation Bills are limited to addressing the immediate fiscal need, they are reasonable. See Baltimore Teachers Union , 6 F.3d at 1020.

The Appropriation Bills are also temporary in nature. Indeed, by their very terms, they are limited to a discrete time period. Their very purpose is to provide "for bare bones expenditures," solely as necessary to keep the State functioning" in the absence of a budget. Megna Aff'd, ¶ 84. The Governor has publicly stated that he will not seek to impose furloughs for more than an eight week period. Megna Aff'd, ¶ 97. Consistent with  the New York State Court of Appeals determination that a wage freeze for a year or more was reasonable, the

temporal scope of the Appropriations Bills must be upheld.  See Subway-Surface Supervisors Assn., 44 N.Y.2d at 107.

As described above, the furloughs were not undertaken as a first step to address the fiscal crisis and impending cash shortage.  Under such circumstances, the furloughs do not, as plaintiffs assert, represent "political expediency."  See Baltimore Teachers Union , 6 F.3d at 1020.  Rather, they are a reasonable and necessary means to avoid fiscal disaster, one of many difficult options critical to addressing a harsh reality.  See id.; Buffalo Teachers Federation, 464 F.3d at 371.

### iv.  The Senate's Resolution

The Court's reliance in its May 12, 2010 Order on Senate resolution 96634-02-0 as an expression of the reasonableness and necessity of the Sixth Emergency Appropriation Bill is misplaced.  Initially, the resolution was only passed by the New York State Senate and, thus, cannot accurately represent the intent and understanding of the full Legislature, the New York State Assembly, or the Governor.  Indeed, a "resolution, unlike a statute, is binding only on the members and officers of the legislative body."  Matter of Moran v. LaGuardia, 270 N.Y. 450, 452 (1936).  "[A] resolution does not prescribe a continuing rule of conduct for government."  MASON'S MANUAL OF LEGISLATIVE PROCEDURE § 145, at 113 (2000 ed.).  Accordingly, instead of demonstrating the expressed intent of the legislative and executive partners in law-making responsible for enacting the Sixth Emergency Appropriation Bill, the resolution offers the non-binding view of one House of the New York Legislature.

Further, "a resolution . . . is invalid and of no effect if in conflict with existing law."  Matter of Doyle, 257 N.Y. 244, 259 (1931).  Because the resolution conflicts with the Sixth Emergency Appropriation Bill – which expresses the intent of the full Legislature and Governor

– the resolution is invalid.  Consequently, the Court should not give it any consideration in addressing the preliminary injunction application.

Finally, a resolution is not a statute or law.  See Matter of Moran, 270 N.Y. at 452; Matter of Doyle, 257 N.Y. at 258; People ex rel. Argus Co. v. Palmer, 12 Misc. 392, 394 (Sup. Ct., Albany County 1895), affd. on opn. below 146 N.Y. 406 (1895).  A resolution "is not effective to modify or repeal a statutory enactment."  Matter of Moran, 270 N.Y. at 452.  "To repeal or modify a statute requires a legislative act of equal dignity and import.  Nothing less than another statute will suffice."  Id.; see also Matter of Torre v. County of Nassau, 86 N.Y.2d 421, 426 (1995); Matter of Gallagher v. Regan, 42 N.Y.2d 230, 234 (1977).  Thus, the resolution cannot and does not have any effect on the validity of the duly-enacted Sixth Emergency Appropriation Bill.   Moreover, while the Senate resolution opines that furloughs are not reasonable and necessary, it does not suggest what alternative measures the Governor could have and should have taken to reduce expenditures in the absence of an enacted state budget.  For all these reasons, the Court should not rely on the resolution as an accurate expression of the reasonableness and necessity of the Sixth Emergency Appropriation Bill.

### D.    The Cases Relied Upon By Plaintiffs Are Not Controlling

Plaintiffs' reliance upon the holdings in  Condell v. Bress, the Surrogates cases and Fraternal Order of Police v. Prince George's County, Maryland is misplaced.  As noted by the Second Circuit in distinguishing Condell and the Surrogates cases, "[t]hat there was an emergency or dire need justifying the impairment was in doubt in those cases."  Buffalo Teachers Federation, 464 F.3d at 373.  Similarly, in Fraternal Order of Police, the United States District Court for the District of Maryland questioned the extent of the deficit claimed by the City of Baltimore.  645 F.Supp.2d 492, 512 (D. Md. 2009).

32

Here, it is undisputed that the State of New York is in fiscal crisis and in imminent danger of running out of cash.  Megna Aff'd, ¶¶ 5, 6, 36, 90.  This is not a case in which the State seeks to add new positions or to simply "offset anticipated State budget shortfalls."  Compare, Association of Surrogates and Supreme Court Reporters within the City of New York v. State of New York, 940 F.2d 766 (2d Cir. 1991) ("Surrogates I") (instituting lag payroll to pay for increased judgeships); Association of Surrogates and Supreme Court Reporters within the City of New York v. State of New York, 79 N.Y.2d 39 (1992) ("Surrogates II") (instituting lag payroll to address anticipated budget shortfalls); see also Condell v. Bress, 983 F.2d 415 (2d Cir. 1993) (instituting lag payroll to address estimated budget deficit).  Rather, this is a case in which the Governor has taken necessary steps in light of an unprecedented revenue crisis that may result in the State running out of cash.  Megna Aff'd, ¶¶ 5, 6, 90.  Notably, the Second Circuit in Condell expressly noted that impairment of state contracts could be justified under the proper conditions. 983 F.2d at 420.  New York's precarious fiscal state and imminent cash shortage provide such justification.  See Buffalo Teachers Federation, 464 F.3d at 373.

Moreover, in the cases relied upon by plaintiffs there is nothing to suggest that the State considered or implemented alternatives to instituting lag payrolls or furloughs.  See Surrogate I, 940 F.2d at 766 (lag payroll); Surrogate II, 79 N.Y.2d at 39 (lag payroll); Condell, 983 F.2d at 415 (lag payroll); Fraternal Order of Police, 645 F.Supp.2d at 492 (furloughs).  In each case, it appears that rather than consider or attempt alternatives, the respective defendants simply implemented the lag or furlough.  In contrast, the record here demonstrates that the Governor not only considered, but implemented various measures to address the unprecedented fiscal crisis and attempt to preserve New York's cash flow.  See generally Megna Aff'd.  Defendants' "obvious reluctance to resort to [furloughs] and [their] decision to do so only when [they]

concluded that [they] had no better alternative belies the 'political expediency' suspected in Surrogates, 940 F.2d at 773, and confirms that [defendants] did not consider salary reductions on a par with other policy choices."  Baltimore Teachers Union, 6 F.3d at 1020.

The record before this Court demonstrates that the State of New York determined to furlough some of its employees only after considering, and implementing, a series of cost-savings measures to address the dire financial position in which it finds itself.

## POINT II

### PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE INJURY

The absence of an adequate remedy at law is the *sine qua non* for the grant of such equitable relief. Sperry International Trade, Inc. v. Government of Israel, 670 F.2d 8, n.5 (2d Cir. 1982) (citing Buffalo Forge Co. v. Ampco-Pittsburgh Corp., 638 F.2d 568, 569 (2d Cir. 1981). The movant must show that the harm which he would suffer is "decidedly" greater than the harm his opponent would suffer if the motion was granted. Id.  Plaintiffs have failed to make such a showing.

The Second Circuit has recognized that "a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990) "A plaintiff seeking injunctive relief bears the burden of demonstrating [he] will suffer 'real and imminent, not remote, irreparable harm' in the absence of a remedy." Henrietta D. v. Bloomberg, 331 F.3d 261, 290 (2d Cir. 2003), quoting, Levin v. Harleston, 966 F.2d 85, 90 (2d Cir.1992)), cert. denied, 541 U.S. 936 (2004).

The Second Circuit has defined "irreparable harm" as "certain and imminent harm for which a monetary award does not adequately compensate." Wisdom Import Sales Co., L.L.C. v.

Labatt Brewing Co., Ltd., 339 F.3d 101, 113 (2d Cir. 2003), citing, Jayaraj v. Scappini, 66 F.3d 36, 39 (2d Cir.1995); Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.1979); Holt v. Continental Group, Inc., 708 F.2d 87, 90-91 (2d Cir. 1983). Thus, "only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief." Id., see also Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.").

In these matters the plaintiffs suggest that this Court may order the defendants to make them whole monetarily if they are successful.  They seek judgments requiring the payment of the delayed four percent salary increase, and compensation for other "financial losses of any kind" (Donohue Complaint, page 14, paragraph (e); see also Brynien Complaint, page 28, paragraph 8).  Assuming, without agreeing, that the plaintiffs are correct about the alleged availability of these forms of damages from the parties they have sued, any claim by the plaintiffs that they have been or will be irreparably harmed by the delay in implementation of the four per cent raise, or even by furloughs, is belied by their own allegations.  Indeed, the Court of Appeals in Condell v. Bress, 983 F.2d at 418-419 (2d Cir. 1993) found that the Eleventh Amendment was no bar to plaintiffs' recovery of pay withheld as part of a lag payroll instituted by the State.  The Court reasoned that

> [since] the eleventh amendment does not bar suits against state officers to enjoin violations of federal law, and any monies that will be restored to the plaintiffs from the state treasury are ancillary to the prospective relief which we order.

35

Condell, 983 F.2d at 419 (citing Association of Surrogates and Supreme Court Reporters Within the City of New York v. State of New York, 940 F.2d 766, 771 (2d Cir.1991), cert. denied, 502 U.S. 1058 (1992) ( *Surrogates I* ).

**1. Furloughs**

Loss of employment with its attendant hardships do not in and of themselves constitute irreparable injury. Sampson v. Murray, 415 U.S. 61, 90 (1974). "It seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury." Jayaraj, 66 F.3d at 39, citing Sampson, 415 U.S. at 90. Injuries "in terms of money, time and energy, necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." Id.

Mass furloughing of employees for an undetermined amount of time has been held not to constitute irreparable harm sufficient to support injunctive relief. Cooper v. TWA Airlines, Inc., 274 F.Supp.2d 231, 239-40 (E.D.N.Y. 2003). "In essence, the plaintiff must quite literally find [himself] being forced into the streets or facing the specter of bankruptcy before a court can enter a finding of irreparable harm." Williams v. State Univ. of N.Y., 635 F.Supp. 1243, 1248 (E.D.N.Y.1986).

**2. Delayed Salary Increase Payments**

Loss of wages by an identifiable group of employees does not qualify as irreparable harm in the Second Circuit. U.S. v. International Broth. of Teamsters, Chauffeurs, Warehousemen & Helpers of America, AFL-CIO 725 F.Supp. 162, 169 (S.D.N.Y.,1989) citing Intern. Bro. of Teamsters v. Pan Am World Airways, 607 F.Supp. 609, 614 (E.D.N.Y.1985); Local 553 Transport Workers v. Eastern Air Lines, 695 F.2d 668, 678 (2d Cir.1982).

None of the plaintiffs have demonstrated the "genuinely extraordinary situation" as would support injunctive relief. As the Supreme Court stated in <u>Sampson</u>, "an insufficiency of savings or difficulties in immediately obtaining other employment-external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself-will not support a finding of irreparable injury, however severely they may affect a particular individual." <u>Sampson</u>, 94 S.Ct. at 937 n.68.

Further, the State intends to pay such raises, retroactively to April 1, 2010, once a budget is enacted for 2010-11. Megna Aff'd, ¶ 86.

Thus plaintiffs cannot establish irreparable harm based on delayed payment of salary increases.

**3. Benefits Freeze**

The Donohue-CSEA plaintiffs further suggest that the actions of the State may result in their inability to fund dental, optical and other insurance benefits as of July 1, 2010. <u>See</u>, Donahue/CSEA Complaint at ¶¶ 30-43. Such argument is, however, too speculative, unsupported and remote to support injunctive relief.

While loss of insurance benefits may support a finding of irreparable harm in certain instances, here the lack of proof of imminent harm precludes such a finding. <u>See e.g.</u>, <u>Building Service 32B-J Pension Fund v. Vanderveer Estates Holding, LLC.</u>, 115 F.Supp.2d 459 (S.D.N.Y. 2000) (without an accounting, the suggestion that a failure to make required contribution payments might result in cut-off of employee benefits was too speculative such that plaintiffs failed to show that any irreparable denial of benefits was imminent); <u>Cooper</u>, 274 F.Supp.2d at 241 (ability of plaintiffs to maintain coverage for a period of time (one month after furlough) and ability to secure coverage thereafter under COBRA materially distinguished that matter from the

two cases cited by the plaintiffs herein for the proposition that loss of benefits can constitute irreparable harm). Cf., Whelan v. Colgan, 602 F.2d 1060 (2d Cir. 1979) (relied upon by the CSEA plaintiffs and involving imminent termination or "block" of payments of welfare benefits to striking union members and their dependents); Communication Workers of Am., Dist. One, AFL -CIO, 898 F.2d 887 (2d Cir. 1990) (also relied upon by the CSEA plaintiffs and involving removal of striking workers from list of covered employees while also frustrating ability of such employees to obtain replacement coverage).

The lack of imminent harm in this regard is readily apparent because the withholding of employee benefit fund contributions is not a permanent abandonment of such funds, but a delay in payment pending an improvement in the State's cash position upon enactment of a budget for the FY 2010-11. Megna Aff'd, ¶¶ 110-111.

Just as the Court concluded that denial of a temporary restraining order on this issue was proper (see: Order dated May 12, 2010, page 7), so, too should the Court deny a preliminary injunction.

For these reasons, even assuming for the sake of argument that any burden on the plaintiffs is substantial, no irreparable harm will result from any of the challenged actions such that injunctive relief is improper and should be denied.

**4.  No Presumption of Irreparable Harm Based on Alleged Constitutional Violation**

Contrary to plaintiffs' contentions, no presumption of irreparable harm should attach simply because the plaintiffs have alleged the violation of a constitutional right.

"[M]ere allegation of a constitutional infringement in and of itself does not constitute irreparable harm. Rather, district courts must consider the nature of the constitutional injury before making such a conclusion." Pinckney v. Board of Educ. of Westbury Union Free School

38

Dist., 920 F.Supp. 393, 400 (E.D.N.Y.,1996),   citing Hone v. Casey, 868 F.2d 69, 72-73 (3d

Cir.), cert. denied, 493 U.S. 848 (1989) (recognizing that not all constitutional harms are

synonymous with irreparable harm, and that the mere assertion of constitutional right, without

more, does not automatically require a finding of irreparable harm); International Dairy Foods

Ass'n v. Amestoy, 898 F.Supp. 246, 250-51 (D.Vt.1995) (same); New Alliance Party v. Dinkins,

743 F.Supp. 1055, 1063 (S.D.N.Y.1990) (same); Public Serv. Co. of N.H. v. Town of W.

Newbury, 835 F.2d 380, 382 (1st Cir.1987) (recognizing that not all allegations of constitutional

violations are sufficiently important to be irremediable by subsequent relief)).

 Cases in which courts have found allegations of a constitutional deprivation sufficient to

presume irreparable harm have involved infringements of First Amendment rights, such as free

speech and association, or other fundamental rights. Galvin v. New York Racing Ass'n, 70

F.Supp.2d 163, 190 -191 (E.D.N.Y.,1998). These rights are viewed to be "of such qualitative

importance as to be irremediable by any subsequent relief." Public Serv. Co. of N.H., 835 F.2d at

382. On the other hand, alleged violation of due process rights, without more, has been held

insufficient to establish irreparable harm. Public Serv. Co. of N.H., 835 F.2d at 382. See also,

Barrett v. Harwood, 967 F.Supp., 744, 747 (N.D.N.Y.1997). This is because alleged violations of

due process or other non-substantive rights are fully capable of being remedied by money

damages. Pickney, 920 F.Supp. at. 400.

 Indeed, the Second Circuit has held that even where violations of substantive rights are

alleged, if money damages could make plaintiffs whole for any loss suffered, such constitutional

injury is plainly reparable and cannot  form the basis for injunctive relief. Savage v. Gorski, 850

F.2d 64, 67-68 (2d Cir. 1988). See also, Meadows v. State University of N.Y. at Oswego, 832

F.Supp. 537 (N.D.N.Y. 1993) (denying preliminary injunction in case alleging violation of First

Amendment because movant failed to establish irreparable harm).

**5.   The Balance of Hardships Do Not Tip In Plaintiffs' Favor And The Public Interest Would Be Disserved By An Injunction.**

The plaintiffs have failed to prove that the balance of hardships tips decidedly in their

favor and have also failed to sustain their burden of proving that the public interest would be best

served through the grant of equitable relief. To the contrary, since this Court can "issue the

injunction only if the balance of  hardships tips in plaintiffs' favor…[and]…the public interest

would not be disserved by the issuance of a preliminary injunction" (Salinger, at *18), such relief

should not lie in this instance.

Plaintiffs' averments focus solely on the alleged hardships that individual employees

might suffer through a reduction of their salaries. This Court cannot ignore the vital public

interest that is served by avoiding wholesale financial impairment of the State and attempting to

restore long-term financial stability. Nor can it be said that the interests of these few plaintiffs are

"decidedly" greater than the harm the public at large may suffer if the injunction is granted.

Sperry International Trade, Inc., 670 F.2d at 8, n.5.

To grant an injunction in this case would ignore the mandates of the Supreme Court and

Second Circuit to properly balance the equities while also giving the proper due and particular

regard for the public consequences of employing the drastic remedy of injunction.

**POINT III**

**ABSENT A FINAL JUDGMENT OF A CONSTITUTIONAL VIOLATION
THIS COURT IS WITHOUT JURISDICTION TO GRANT THE SALARY INCREASES
REQUESTED BY THE PLAINTIFFS ON THEIR MOTIONS FOR
INTERIM INJUNCTIVE RELIEF.**

This Court may not order the appropriation of state funds without a final judgment holding that a constitutional violation has occurred. Milliken v. Bradley, 433 U.S. 267, 289 (1977) (allowing a prospective injunction which required defendants to conform their conduct to federal law after a Fourteenth Amendment violation was found). The Supreme Court has clearly stated that there are fundamental limitations on the remedial powers of the federal courts to restructure the operation of state government. This power is not plenary, but rather, may only be exercised upon the finding of a constitutional violation. Hills v. Gautreaux, 425 U.S. 284, 292 (1976); Milliken v. Bradley, 418 U.S. 717, 737 (1974) (noting that federal remedial powers may only be used upon the finding of a constitutional violation). Thus, while the federal courts have broad remedial powers to affect state government operations once a constitutional violation has been conclusively found, it is not clear that the courts can intrude upon state operations at the preliminary injunction stage. A preliminary injunction is meant to preserve the status quo until a final hearing upon the merits, and it is not intended to effectively grant the relief ultimately sought. See Jordan v. Wolke, 593 F.2d 772, 773-74 (7th Cir.1978). In Jordan, the district court ordered the building of new jail facilities as a preliminary measure until a full hearing on the merits of plaintiffs' due process and equal protection claims could be heard. The circuit court, in reversing the district court, noted that the federal courts could not order the state to appropriate money for prison reform (id. at 775) upon the presumed basis that the federal courts may only require the state to indirectly take such action after a constitutional violation has been conclusively found. See Holt v. Sarver, 309 F. Supp. 362, 385 (E.D.Ark.1970) (where although

the court did not directly order the state to appropriate funds for prison reform, it ordered that if the prison system was to continue operating it would have to do so in a constitutional manner).

Thus, the Governor should not be required, as part of a preliminary injunction, to seek appropriation of funds to pay the salary increase.  Not until a constitutional violation has been conclusively found upon final judgment may this Court exercise its remedial powers and order the defendants to implement the appropriate relief

## CONCLUSION

The Court should deny all the interim relief sought by the plaintiff and should, in addition, dissolve the temporary retraining order it issued on May 12, 2010.  Plaintiffs can neither demonstrate a likelihood of success on the merits, nor can they show irreparable harm.

Dated: Albany, New York
       May 19, 2010

ANDREW M. CUOMO
Attorney General of the State of New York
Attorney for Defendants

By: s/ * *Jeffrey Dvorin,* B/R # 101559
         Jeffrey Dvorin
Assistant Attorney General, of Counsel
Bar Roll No. 101559
Telephone:  (518) 473-7614
Fax:  (518) 473-1572 (Not for service of papers)
Email: jeffrey.dvorin@ag.ny.gov

TO:   Steven A. Crain
Timothy Connick
NANCY E. HOFFMAN, GENERAL COUNSEL
Civil Service Employees Association, Inc.
Box 7125, Capitol Station
143 Washington Avenue
Albany, New York 12224

William  P. Seamon, Esq.
1168-70 Troy-Schenectady Road
P.O. Box 12414
Albany, New York 12212-2414

Richard E. Casagrande, Esq.
800 Troy-Schenectady Road
Latham, New York 12110-2455