**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DANNY DONOHUE, as President of the Civil Service Employees**
**Association, Inc., Local 1000, AFSCME, AFL-CIO, and CIVIL**
**SERVICE EMPLOYEES ASSOCIATION, INC., LOCAL 1000,**
**AFSCME, AFL-CIO,**

|  |  |
|---|---|
| **Plaintiffs,** |  |
|  | **Civil Action No.** |
| **-against-** | **10-CV-00543** |
|  | **(LEK)(DRH)** |

**DAVID A. PATERSON, as Governor of the State of New York, NEW**
**YORK STATE ASSEMBLY, NEW YORK STATE SENATE,**
**JONATHAN LIPPMAN, as Chief Judge of the New York Unified Court**
**System, and the STATE OF NEW YORK,**

**Defendants.**
_____

### _PLAINTIFFS DONOHUE'S AND CSEA'S_
### _REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF_
### _APPLICATION FOR PRELIMINARY INJUNCTION_

**NANCY E. HOFFMAN**
**Timothy Connick, of Counsel**
**Bar Roll #506163**
**Attorneys for Plaintiffs**
**Civil Service Employees Association, Inc.**
**Box 7125, Capitol Station**
**143 Washington Avenue**
**Albany, New York 12224**
**(518) 257-1443**
**tim.connick@cseainc.org**

**Timothy Connick,**
**Steven A. Crain,**
**Miguel Ortiz,**
**Paul S. Bamberger,**
**Daren J. Rylewicz,**
**Leslie C. Perrin,**
**Eric E. Wilke,**
**Kara L. Hilburger,**
**    On the Brief**

## <u>TABLE OF CONTENTS</u>

Page

**PRELIMINARY STATEMENT** ..................................................3

**POINT I**

      **THE UNDISPUTED FACTS SHOW THAT DEFENDANTS
ARE SUBSTANTIALLY IMPAIRING CSEA CONTRACTS
FOR IMPROPER PURPOSES, IN AN UNREASONABLE AND
UNNECESSARY MANNER** ...................................................... 3

      1.    CSEA contracts are substantially impaired ........................ 3

      2.    Defendants' actions serve no legitimate purpose ................ 5

      3.    Defendants are using unreasonable and unnecessary means .......................... 7

      4.    The New York State Legislature has not made a finding of a financial
emergency to justify these substantial contract impairments; to the
contrary, defendant NEW YORK STATE SENATE has declared that
the means are unreasonable and unnecessary ..................... 11

      5.    Defendants' claimed legal basis to withhold salary increases has
already been *specifically* rejected by the courts ................. 14

**POINT II**

      **PRELIMINARY INJUNCTIVE RELIEF IS NECESSARY AND
APPROPRIATE AS PLAINTIFFS WILL SUFFER
IRREPARABLE HARM BY REASON OF THE
IRREVERSIBLE IMPACT AND NATURE OF THE INJURIES** ............................ 18

      1.    The constitutional violations herein require injunctive relief ......................... 18

      2.    Plaintiffs' limited relief in this federal proceeding requires
injunctive relief .................................................... 20

      3.    The irreversible impact of the injuries requires injunctive relief ................... 21

      4.    The requested relief is appropriate and narrowly tailored.............................. 24

**CONCLUSION** ................................................................ 24

## PRELIMINARY STATEMENT

Plaintiffs DANNY DONOHUE, as President of the Civil Service Employees Association, Inc., Local 1000, AFSCME, AFL-CIO, and the CIVIL SERVICE EMPLOYEES ASSOCIATION, INC., LOCAL 1000, AFSCME, AFL-CIO (hereinafter "CSEA"), submit this memorandum of law in reply to defendants' opposition to CSEA's application for a preliminary injunction and in further support thereof.

It is respectfully submitted that the undisputed facts reflect that Governor Paterson's *ad hoc*, inconsistent and illogical actions, done to pressure legislators and CSEA, are not for a legitimate public purpose (but, rather, plainly to generate political pressure), can scarcely be considered reasonable or necessary under the circumstances, and thus, are clearly unconstitutional.  Further, it is respectfully submitted that Governor Paterson's blatant, unprecedented unlawful actions, with the particular harm those actions are causing, most certainly justify immediate injunctive relief under the applicable authority.

## POINT I

**THE UNDISPUTED FACTS SHOW THAT DEFENDANTS ARE SUBSTANTIALLY IMPAIRING CSEA CONTRACTS FOR IMPROPER PURPOSES, IN AN UNREASONABLE AND UNNECESSARY MANNER.**

The facts and circumstances herein, either admitted or not disputed by defendants, establish that defendants are substantially impairing CSEA contracts, without a legitimate purpose and in an unreasonable and unnecessary manner.

**1.      CSEA contracts are substantially impaired.**

Defendants have conceded that the impairments as to the furloughs and the CSEA EBF are substantial (*see* Defendants' Memorandum of Law, pp.17-19).

Defendants contend, however, that the refusal to pay the bargained-for wage increases is not

substantial because the salary raises are "only" delayed (Defendants' Memorandum of Law, p.18). Defendants claim that the raises will be paid when a budget is finally passed; however, the duration of this "delay" is indefinite and could last months.  Given the state of negotiations between the Governor and the Legislature, a budget might not be enacted until after the elections in November (Turner Reply Affidavit ¶17).  This could mean a delay of more than seven months, or longer.

In this regard, a wage freeze of up to one year was found to be a substantial impairment in *Subway-Surface Supervisors v. NYC Transit Authority*, 44 N.Y.2d 101 (1978); a wage freeze for an indefinite period was found to be a substantial impairment in *Buffalo Teachers Federation v. Tobe*, 464 F.3d 362, 365 (2d Cir. 2006); and a furlough which effectively would be refunded within six weeks was found to be substantial in *Massachusetts Community College v. Commonwealth*, 420 Mass. 126 (Mass. 1995).

Importantly, defendants do not dispute that CSEA agreed in contract negotiations to various immediate concessions, such as increased medical deductibles and co-pays and, in exchange, the contracts were back-loaded so that the largest of the salary increases (4%) was to take effect April 1, 2010 (Hanna Affidavit ¶¶7-9, Exhibit A; Donohue Affidavit ¶¶13-14).  By denying the payment of these back-loaded raises, defendants are depriving CSEA of the essential "benefit of its bargain" and, in so doing, are substantially impairing these contracts.

It is also significant that the denial of the raises is part of a multi-prong assault on the CSEA contracts.  Within a matter of weeks, defendants, unexpectedly and for an indefinite period, intend to cut CSEA-represented members' pay 20% on a weekly basis, deny them the 4% raise, and not fund their dental and vision benefits.  Whether singularly and cumulatively, defendants' actions in denying the bargained-for raises substantially impair the CSEA contracts.

**2.     Defendants' actions serve no legitimate purpose.**

With respect to the furloughs and wage freeze, the facts show that the Governor's purpose here is to bluntly apply his power to bludgeon CSEA into succumbing to his "negotiating" demands.  As to the EBF, there is no legitimate purpose in withholding the funds.  Wholly unlike those situations where substantial contract impairments have been found permissible, the Governor has no tailored and careful plan to deal with the State's financial problems such as to justify his actions.

Regarding defendants' claim that the mandated furloughs are supposedly a "multi-faceted approach to address the State's budget gaps" (Megna Affidavit ¶6), Governor Paterson has directly stated that he took that action specifically to pressure the Legislature to pass a budget (Turner Affidavit ¶14, Exhibit H).  Tellingly, defendants make no mention of these comments as to the Governor's intent in their opposition papers and no affidavit from the Governor was submitted to the Court.  The Governor has also said he is implementing furloughs to pressure the labor unions into contract givebacks (Turner Affidavit ¶¶27, 30-33, Exhibits K, P).  Defendants do not dispute that the purpose of the furloughs is to apply pressure on the unions.  Indeed, the furlough bill *expressly* provides that if the unions agree to give-backs, furloughs will be cancelled (Turner Affidavit ¶15, Exhibit I).

As to the indefinite cancellation of the raises supposedly for the purpose of "having sufficient cash on hand" (Megna Affidavit ¶6), that is not the reason given by the Governor.  Governor Paterson has repeatedly issued statements that the actual reason that he did not permit the implementation of raises was to pressure the Legislature into passing the annual budget (Turner Affidavit ¶¶5, 7, 11-12, Exhibits A, E, F).

Completely contrary to Megna's inaccurate statements about CSEA obstinacy, the negotiations between CSEA and the State leading up to the Governor's unilateral delay of the raises and his furlough announcement show that the *very* purpose of the Governor's actions was to force a lag payroll plan on CSEA.  As set out in the Reply Affidavits of Fran Turner and Ross Hanna, discussions between the Governor's Staff and CSEA were ongoing and seemingly fruitful until the Governor, apparently frustrated that CSEA would not just consent to a payroll lag, suddenly but publicly announced the cancellation of the raises and, two weeks later, the imposition of the furloughs.  These actions were clearly the result of the Governor's impatience, unwillingness, and perhaps inability to effectively or appropriately negotiate with CSEA.

The real purpose for the furloughs and cancellation of the raises was to pressure legislators and strong-arm CSEA, and not some "multi-faceted approach to address the budget gap."  It was the exercise of heavy-handed governmental authority to crush opposition and override hard-fought negotiated contracts.  This can hardly be considered a "legitimate public purpose."  As the Second Circuit held in *Surrogates I*, 940 F.2d at 773, the Contract Clause exists as a constitutional check on the other branches of government for the very purpose of guarding against such acts of political expedience by elected officials.

As to the EBF, the State's justification is, amazingly, just that "the State simply lacks the funds" (Megna Affidavit ¶111).  As with any creditor, it is hardly a lawful justification to say that one is not paying a contractual obligation because one just does not have the money.  There is no authority anywhere to support defendants' apparent proposition that it is a "legitimate public purpose" to impair a contract because a State purportedly does not have the funds.  If a State can avoid its obligations by saying it needs to spend money on something else, as the Supreme Court held in *United States Trust Co.*, 431 U.S. 1, 30-31 (1977), it would give a State excessive leeway to

"find a use for extra money" and ignore binding commitments in favor of the State's own "self-interest."  As is abundantly clear from the Mauro Reply Affidavit accompanying these reply papers, it surely appears that the State has had more funds available than it has acknowledged throughout this entire ordeal.  Plainly, defendants' substantial impairment of CSEA contracts does not have a legitimate public purpose.

**3.      Defendants are using unreasonable and unnecessary means.**

The erratic, inconsistent and illogical means chosen to substantially impair CSEA's contracts are wholly unreasonable and unnecessary.  Regarding the furloughs, the amount saved is an extremely tiny fraction, only a third of one percent on a weekly basis of the Governor's estimate of the budget deficit (Turner Affidavit ¶20).  And if the objective truly is cost savings, the furloughs tellingly do not cover the more highly paid managerial/confidential employees, Court employees, or legislative employees (Turner Affidavit Exhibit I; Hanna Affidavit ¶22, Exhibit C; Donohue Affidavit ¶10).

Megna claims that managerial/confidential employees were not covered because their furloughs would not have saved very much money, those employees have not received their prior raises, and there was a concern it could lead to difficulty in retention and hiring managers (Megna Affidavit ¶96).  Does the State think that immediately cutting CSEA-represented employees' pay by 20%, where they too have been denied their raises, will be good for retention, hiring and morale of these tens of thousands of employees?  And defendants do not explain why court or legislative employees are excluded.  If the State is as financially desperate as Megna attempts to portray, why hasn't the Governor imposed an across-the-board furlough imposed on all employees?  Given their limited financial impact, the furloughs are clearly unreasonable; given the magnitude of the budget gap, the disparate application of the furloughs constitutes an additional irrationality.

As to non-payment of the raises, defendants say that the raises will be paid once the budget is enacted.  If true, the delay will obviously not save any money.  And, again, completely illogically, the Governor has simultaneously funded raises for the generally higher paid CSEA unit employees working for UCS (Turner Affidavit ¶9, Exhibits B, C, D, G, I).  Defendants make no mention of this nonsensical inconsistency in their papers.

Defendants' justification for not paying the EBF (i.e., they just do not have the money; Megna Affidavit ¶111) can hardly be considered a reasonable basis to substantially impair the CSEA contracts.

Unionized wages are only a very small percentage of the entire State budget (Mauro Reply Affidavit ¶6).  Thus, the Governor would substantially impair CSEA's contracts for an extremely minimal budget effect (Mauro Reply Affidavit ¶¶3, 11).  The portion of the General Fund that is comprised of unionized employees' wages, in total, is at most 4.2% (Mauro Reply Affidavit ¶6).  By way of comparison, the component of State spending on "Local Assistance" comprises over 45% of the total State budget, amounting to $58.910 billion out of $141.497 billion (Mauro Reply Affidavit ¶¶ 4, 9).

In *Baltimore Teachers Union v. Baltimore*, 6 F.3d at 1020 (4th Cir. 1993), upholding a 1% salary reduction, personnel costs constituted a large percentage of the City's total budget.  In contrast to the situation here, personnel costs there alone comprised 91.8% of the City's police department budget and 82.5% of the public schools budget.  In *Fraternal Order of Police v. Prince George's County*, 645 F.Supp.2d 492 (D. Maryland 2009), which struck down the County's proposed furloughs, the savings from the furloughs would have solved *one third* of the County's budget deficit.  *Id*. at 511.  Here, Megna admits that, even if the Governor were to extract all the

concessions he wanted from the unions, totaling $250 million, it would only account for 2.9% of the total $8.5 billion projected deficit (Megna Affidavit, ¶13).

In this regard, it should be noted that on April 1, 2010, the Governor issued a press release stating that the projected deficit for the 2010-2011 fiscal year was over $9 billion (Turner Affidavit Exhibit J), but Megna now states that the projected deficit is $8.5 billion (Megna Affidavit, ¶¶5, 18, 78).  This difference of over $500 million between these two estimates underscores how insignificant the Governor's substantial contract impairments are to addressing the deficit.

In terms of the specific chosen means, defendants do not cite a single case that upheld a furlough of the State's unionized employees.  In *Massachusetts Community College v. Commonwealth,* 420 Mass. 126 (1995), which involved state employees, the Commonwealth attempted to use some of the same justifications for its furloughs that are listed in the Megna Affidavit, all of which were rejected by the court.  There, Massachusetts claimed it was running out of cash because the "estimated revenues for the 1991 fiscal year … would be insufficient to meet the expenditures authorized and anticipated in that fiscal year."  *Id.* at 129.  That claim, however, was insufficient there to justify the substantial impairment of the unions' contracts.

Similarly, a State's bare claim of financial crisis has been rejected by the courts as insufficient to justify impairment of union contracts.  In *Carlstrom v. State of Washington*, 103 Wash.2d 391, 396 (1985), the court struck down a wage freeze, stating that a state's claim of "economic emergency" is not "sufficient of itself to permit states to abrogate contracts."  The Ninth Circuit also struck down the State of Hawaii's lag payroll plan in *University of Hawaii Professional Assembly v. Cayetano*, 183 F.3d 1096, 1107 (9th Cir. 1999), holding that the state's claim of "budgetary crisis" alone was insufficient to justify the lag.

A close examination reveals that the Megna Affidavit does not actually say that the State has run out of cash or even that it will run out of cash.  Megna offers only speculation that the State *might* run out of cash.  Megna says he decided to hold off making payments in December 2009 and March 2010 because, according to DOB estimates that turned out to be off the mark, he thought he might run out of cash (Megna Reply Affidavit ¶¶7-8, 33-40).  In fact, hard data shows that Megna's negative predictions in this regard were grossly exaggerated (Mauro Reply Affidavit ¶¶12-21).

In regard to Megna's decision to withhold $750 million in payments in December 2009, the Updated Executive Budget published by Megna's own office on February 9, 2010, shows that the State, in fact, had over $1.5 billion in cash reserves available in December, even *after* subtracting the $750 million in payments that Megna had withheld in December (Mauro Affidavit ¶¶13-14; page T-62 of Exhibit A thereto).  The balance in all funds at the end of December 2009 was $2.265 billion.  After subtracting out the $750 million in payments that the State withheld in December, the State still had a cash balance of $1.515 billion in the total of all funds.  *Id.*  Similarly, in March, Megna withheld the prepayment of $2.06 billion in school aid that is normally paid that month (Megna Affidavit ¶38).  In fact, documents published in May show that the State had over $1 billion more cash available at that time, above and beyond the amount needed to pay the $2.06 billion in school aid in March (Mauro Affidavit ¶¶17-20; and p. 1 of Exhibit B thereto).  Again, these facts show that Megna's negative claims in March were grossly exaggerated.  *Id.*

These kinds of vague estimates by a governmental employer claiming financial weakness and "fluctuating figures" are exactly the kinds of claims that the court in *Prince George's County, supra,* 645 F.Supp.2d at 511, found inadequate to justify the contract impairment in that case.  As that court held:

> The Court does not question that the County faced a deficit but what remains unclear in light of the fluctuating figures is the extent of the problem the County sought to address.

The court further held that, to uphold a substantial contract impairment, the government's actions must be "narrowly tailored" to meet specific budgetary needs. *Id*. at 511.

Here Megna admits that, given the current status of the process of budget negotiations with the Legislature, "this process has not lent itself to a comprehensive plan to address the State's deficit" (Megna Affidavit, ¶89). The furloughs and the withholding of the raises and the EBF payments, therefore, are clearly not "narrowly tailored" to meet the State's financial problems, and they are not, by Megna's own admission, part of a "comprehensive plan."

We must compare this with the situation in *Buffalo Teachers Federation*, wherein the City of Buffalo carefully developed and adopted a "four-year financial plan" which was approved by the Buffalo Fiscal Stability Authority in October 2003 (*Id.* 464 F.3d at 366). The cap on wages was implemented in April 2004 based on a specific determination by the Fiscal Stability Authority, pursuant to statute, that "a wage freeze with respect to the City and all Covered Organizations is essential to the maintenance of the revised financial plan." In contrast here, as Megna admits, the State has no overall financial plan. In this environment, it can only be concluded that, to date, defendants' means have been unreasonable and unnecessary.

**4.     The New York State Legislature has not made a finding of a financial emergency to justify these substantial contract impairments; to the contrary, defendant NEW YORK STATE SENATE has declared that the means are unreasonable and unnecessary.**

It is extremely important to consider that, unlike other similar cases, there has been no finding by the State Legislature that there is a financial crisis and that the substantial impairments are reasonable and necessary. Here, to the complete contrary, one of the two New York State

legislative bodies of has actually determined that "it is *not* reasonable or fiscally necessary to impose furloughs" (*emphasis added*) (Connick Affidavit Exhibit A).

Defendant NEW YORK STATE SENATE specifically found, via resolution on May 10, 2010, that Governor Patterson's actions were unlawful and *not* reasonable or fiscally necessary and that it was passing the extender bill *solely* to prevent the complete shutdown of the State government (Connick Affidavit ¶4, Exhibit A). Defendants, however, state that this one house legislative finding should simply be ignored because it was "only" a resolution (Defendants' Memorandum of Law, pp. 31-32).

While a resolution is not a law, it is a declarative act of a legislative body of a special character that most certainly should be given consideration as to the intent of that body. *Jewett v. Luau-Nyack Corp.*, 31 N.Y.2d 298, 338 N.Y.S.2d 874, 291 N.E.2d 123 (1972); *Quaglia v. Incorporated Village of Munsey Park*, 54 A.D.2d 434, 389 N.Y.S.2d 616 (2d Dep't 1976), *judgment aff'd on other grounds*, 44 N.Y.2d 772, 406 N.Y.S.2d 30, 377 N.E.2d 473 (1978). For this reason, a resolution can have persuasive authority and unique usefulness in ascertaining the purpose and history of a legislative act. *Astoria Gas Turbine Power, LLC v. Tax Com'n of City of New York*, 14 A.D.3d 553 (2d Dept. 2005); *Ganley v. Giuliani*, 171 Misc.2d 654 (Sup. 1997), *aff'd.* 253 A.D.2d 579 (1st Dept. 1998), *rev'd on other grounds*, 94 N.Y.2d 207 (1999).

The courts have given particularly careful consideration to legislative findings and determinations as to the legitimacy of the purpose and the reasonableness and necessity of contract impairments in fiscal emergency cases. In *Buffalo Teachers v. Tobe* (464 F.3d 362, 368, 2d Cir. 2006), for example, with respect to the imposition of a wage freeze, the court made particular note that the State Legislature had found that a financial emergency existed in the City of Buffalo. *See,* New York Public Authorities Law §850-a. The Second Circuit found especially significant (465

F.3d at 365), that the State Legislature had *declared* that the City was "in a state of fiscal crisis, and that the welfare of the inhabitants of the City is seriously threatened." It was in this context that the Second Circuit upheld the finding that the Buffalo wage freeze was reasonable and necessary.

Likewise, in *Subway-Surface Supervisors Assn. v. NYC Transit Authority* (44 N.Y.2d 101, 107, 1978), the Transit Authority's imposition of a wage freeze was supported by legislative findings that a financial emergency existed in the City of New York and the specific need for the State to exercise its police and emergency powers under the Constitution to bring the emergency under control. The State Legislature had specifically found, the Court of Appeals noted at 112, that the wage freeze "was a necessary and appropriate step toward relieving the financial crisis."

Here, the situation is precisely the opposite; the New York State Legislature has made no such finding and the NEW YORK STATE SENATE has even expressly declared that the Governor's means are unlawful, unreasonable and unnecessary. Of course this finding should be given due consideration.

In this regard, it is particularly noteworthy that defense counsel states that defendants NEW YORK STATE ASSEMBLY and NEW YORK STATE SENATE oppose the application for a preliminary injunction "*exclusively* on the grounds that they are not proper parties" (*emphasis added*) (Defendants' Memorandum of Law, p. 2, ftnt. 1). No affidavits or other proof is offered from these defendants. Arguably, by reason of defense counsel's statement, these defendants do not otherwise oppose the application and, at least in the case of the Senate, if not faced with the dire alternative of shutting down state government, would support it.

Under these circumstances, the lack of a formal State Legislative declaration of a financial emergency to support the necessity for these substantial contract impairments and the existence of

the Senate's May 10th Resolution to the contrary, are powerful indications that the Governor's actions constitute wholly unjustified and unlawful impairments.

**5.      Defendants' claimed legal basis to withhold salary increases has already been _specifically_ rejected by the courts.**

Defendants wrongfully assert that they can hold back salary increases because of the mandatory contractual language under Civil Service Law §204-a requiring _annual_ legislative approval for items requiring funding. (Defendants' Memorandum of Law, pp. 22-23; Megna Affidavit ¶49).

In _Association of Surrogates v. State_, 78 N.Y.2d 143 (1991), the Court of Appeals specifically held, at 155-156, that "the ratification statute explicitly approves the pay increases scheduled for each year of the three-year agreement … thus supporting plaintiffs contention that by ratifying the agreements the Legislature gave approval within the meaning of section 204-a(1) to the entire three-year obligation expressed in the contract, not simply the first year."  The Court of Appeals went on to plainly rule that "Civil Service Law §204-a(1) does not make the compensation sections of collective bargaining agreements before us conditional upon or subject to annual appropriations."  _Id._ at 156.

Here, the ratification statute likewise approved the multi-year increases (Laws of 2008, Chapter 10, Part A).  Accordingly, the State, in accord with _Association of Surrogates_, cannot avoid its obligations by trying to claim that the requirement of annual legislative approval gives them an "out."  Defendants make no mention of _Association of Surrogates_, much less try to distinguish it.

Along the same line, defendants assert that the following ratification bill language permits them to withhold the increases:

Notwithstanding any of the foregoing provisions of this section, any

14

> increase in compensation may be withheld in whole or in part from any
> employee to whom the provisions of this section are applicable when, in
> the opinion of the director of the budget and the director of employee
> relations, such increase is not warranted or is not appropriate.

(Megna Affidavit ¶¶52, 86).  By its plain wording, however, this language does not permit the

State to, in a wholesale fashion, just write out salary requirements of the collective bargaining

agreements.  Rather, that language refers to withholding any increase in compensation to "any

employee" and obviously refers to individual, unique and particular situations where "such

increase is not warranted or is not appropriate."  There is no mention therein to anything involving

budget issues or the complete avoidance of salary requirements of entire bargaining units.

It is axiomatic that the interpretation of a statute must begin, and usually ends, with the text

of the statute.  *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 475, 112 S.Ct. 2589, 2594,

120 L.Ed.2d 379 (1992);  When interpreting the text, courts give undefined terms their plain,

ordinary, and most natural meaning. *Asgrow Seed Co. v. Winterboer,* 513 U.S. 179, 187, 115 S.Ct.

788, 793, 130 L.Ed.2d 682 (1995).  It is a 'fundamental canon of statutory construction that the

words of a statute must be read in their context and with a view to their place in the overall

statutory scheme.'  *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133, 120 S.Ct.

1291, 146 L.Ed.2d 121 (2000) (quoting *Davis v. Michigan Dept. of Treasury,* 489 U.S. 803, 809,

109 S.Ct. 1500, 103 L.Ed.2d 891 (1989)).

"[V]ague notions" about a statute's overall purpose cannot be allowed "to overcome the

words of its text regarding the specific issue under consideration."  *Mertens v. Hewitt Associates,*

508 U.S. 248, 261, 113 S.Ct. 2063, 2071, 124 L.Ed.2d 161 (1993).  'Nonsensical interpretations of

contracts, as of statutes, are disfavored ... [n]ot because of a judicial aversion to nonsense as such,

but because people are unlikely to make contracts, or legislators statutes, that they believe will have

absurd consequences.'  (quoting *FutureSource L.L.C. v. Reuters Ltd.,* 312 F.3d 281, 284-85 (7th

Cir.2002)). *Treadway v. Gateway Chevrolet Oldsmobile Inc.,* 362 F.3d 971, 976 (7th Cir.2004)

In fact, it was never the contemplation of the parties, in any negotiation, at any time, that the State have the right to unilaterally suspend across-the-board salary increases if the budget and employee relations directors so decided (Hanna Reply Affidavit ¶¶11-14).  It is nonsensical to assume that CSEA, or any employee union, would negotiate wage increases with the understanding that such increases can be summarily withheld on the opinion of two functionaries that "such increase is not warranted or is not appropriate."  Moreover, there is no indication in defendants' response that the Director of Employee Relations made a determination that it was "appropriate" or "warranted" to withhold the increase from any employee, let alone all employees.  Defendants claim that this clause gives them the right to withhold negotiated wage increases is nothing more than a stab in the dark to try to bootstrap otherwise unjustified action by giving unintended meaning to a clause taken completely out of context, and contrary to its actual intent.

The overall statutory scheme approving wage increases for the State workforce makes clear that defendants' interpretation is wrong.  In stark contrast to the CSEA legislation, language of the M/C salary legislation, which defendants also quote, expressly states that M/C salary increases can be withheld "when, in the opinion of the director of the budget, such withholding is necessary … to reduce state expenditures to acceptable levels" (Megna Affidavit ¶60).  Differences in this language from the CSEA ratification language reveal, *ipso facto*, that the CSEA language does not authorize the State to cancel raises to all CSEA-represented employees for budget reasons *or* for any reason. M/C employees, on the other hand, being non-unionized and not benefiting from protections of a collective bargaining agreement, can be treated as the State sees fit.

Defendants fail to mention that this same CSEA "withholding" language has been in every CSEA ratification bill since at least 1982.  *See,* Laws of 2005, Chapter 9, Section 7(14); Laws of

2000, Chapter 68, Part A, Section 5(14); Laws of 1995, Chapter 315, Section 7(13); Laws of 1992, Chapter 489, Section 7(15); Laws of 1988, Chapter 582, Section 14(11); Laws of 1985, Chapter 302, Section 15(11); Laws of 1982, Chapter 220, Section 7(17).  Significantly, this language was in the ratification bills at the very time of the *Association of Surrogates* ruling and no one ever claimed then that it could be used to permit the wholesale denial of salary requirements contained in collective bargaining agreement "for budget reasons."  *See*, the CSEA and PEF cases, *McDermott v. Cuomo*, 1992 WL 133900 (N.D.N.Y. 1992) and *Condell v. Bress*, 983 F.2d 415 (2d Cir. 1993).

Consistently, for these past several decades, the language has never been used for the purpose of a wholesale refusal to pay across-the board negotiated salary increases (Hanna Reply Affidavit ¶13).  There has never even been a *claim* by anyone for those many decades that the language could be used in such a dramatic fashion.  From the most basic common sense point of view, why would CSEA or any union agree to a clause that would allow the State to unilaterally nullify the key money provisions of its collective bargaining agreements?  Defendants' position in this regard is unfounded and patently absurd.

As the Court of Appeals discussed in *Association of Surrogates*, the purpose of the Taylor Law is the stability of the State workforce through the negotiation of multi-year agreements. Specifically, the Court of Appeals therein rejected the State's argument that the salary provisions of a multi-year agreement could be disregarded when it came time to appropriate funds each year, stating, "under defendants' interpretation . . . salary terms . . . requiring an expenditure of additional funds by a public employer would be at risk of annual revision through the appropriation process." *Id.* at 154.   As stated in *Association of Surrogates*, here too,

> Defendants do not suggest that plaintiff labor organizations have any
> power corresponding to the Legislature's unilateral power to modify the

provisions of multiyear collective bargaining agreements that require
expenditures, or that they have any recourse . . . .

*Id.* at 154.  The Court of Appeals concluded that, "This imbalance conflicts with the Taylor Law,"

and would be a disincentive to contract negotiations.  *Id.* at 154-55.  Defendants' position is wholly

untenable and has been directly refuted by the New York State's highest court.

### POINT II

**PRELIMINARY INJUNCTIVE RELIEF IS NECESSARY AND APPROPRIATE
AS PLAINTIFFS WILL SUFFER IRREPARABLE HARM BY REASON OF
THE IRREVERSIBLE IMPACT AND NATURE OF THE INJURIES.**

**1.      The constitutional violations herein require injunctive relief.**

Contrary to defendants' arguments, the Second Circuit has specifically held that where a

government action directly harms a constitutional right, the irreparable nature of the harm must be

presumed.  *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 331 F.3d 342, 349-50 (2d Cir.

2003).  One district court captured the essence of the analysis, noting that where the violation of the

constitutional right is the irreparable harm asserted, "the two prongs of the preliminary injunction

threshold merge into one: in order to show irreparable injury, plaintiff must show a likelihood of

success on the merits." *Turley v. Giulani*, 86 F.Supp. 2d 291, 295 (S.D.N.Y. 2000).  Irreparable

injury is thus established where plaintiffs have shown a clear and substantial probability of success

on the underlying constitutional claim.  The district court in *Association of Community*

*Organizations for Reform Now v. U.S.*, 2010 WL 809960 (E.D.N.Y.), at *17, for just one very

recent example, found irreparable harm because the plaintiff showed a likelihood of success on the

merits regarding a violation of the Bill of Attainder Clause.

The cases cited by defendants from district courts and other circuits involve different

circumstances and do not obviate the Second Circuit prevailing rule that a constitutional

deprivation of a substantive right constitutes irreparable harm.  *See, Johnson v. Miles*, 355 Fed.

Appx. 444, 446, 2009 WL 3326622, (2d Cir. 2009) ("alleged violation of a constitutional right 'triggers a finding of irreparable harm.'") citing *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir.1996) and *Statharos v. New York City Taxi and Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir.1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary.") (*citation omitted*); *Connecticut Dept. of Environ. Conservation v. OSHA*, 356 F.3d 231 (2d Cir. 2004); *Scelsa v. CUNY*, 806 F.Supp. 1126, 1135 (S.D.N.Y. 1992).

Defendants misapply the reasoning of *Pinckney v. Board of Educ., of Westbury Union Free School District*, 920 F.Supp. 393 (E.D.N.Y. 1996). Plaintiffs are not merely alleging a constitutional violation that must await discovery or a trial on the merits, as in that case, but have shown herein that defendants have violated the Contract Clause of the Constitution. Moreover, *Pinckney* involved a matter where there was a parallel state administrative proceeding that required the court to abstain from reaching the merits of the due process claim.

The other cases cited by defendants are equally inapplicable. *Public Service Co. v. West Newbury*, 835 F.2d 380 (1st Cir. 1987) involved the removal of utility poles which the court found did not constitute irreparable harm because the poles could be reinstalled at a later date, if the plaintiff prevailed. More significantly, the court found that plaintiff's complaint failed "as a matter of law to comprise a cause of action for deprivation of a constitutional right." *Id*. at 382. With respect to *Barrett v. Harwood*, 967 F.Supp. 744 (N.D.N.Y. 1997), the court found plaintiffs failed to establish a likelihood of success on their Section 1983 claims and that monetary damages would remedy any damage plaintiffs would suffer. In contrast, a Contract Clause violation is precisely the type of constitutional violation that is of such "qualitative importance" that a continued impairment will be "irremediable by subsequent relief." *Id*. at 746.

The impairment of a contract in violation of the Contract Clause of the Constitution has been specifically held to constitute irreparable harm. *See, University of Hawaii Professional Assembly v. Cayetano*, 16 F.Supp.2d 1242 (D. Hawaii, 1998), *aff'd.* 183 F.3d 1096, 1108 (9th Cir. 1999); *West Indian Co., Ltd. v. Government of Virgin Islands*, 643 F.Supp. 869, 882 (D.V.I. 1986) ("The interference with [the plaintiff's] contractual right in violation of the Contract Clause, standing alone, is sufficient irreparable harm to support the" issuance of an injunction.) *aff'd.* 812 F. 2d 134 (3d Cir.1987). Surely the ongoing constitutional violations, such as the proposed furloughs and the deprivation of negotiated pay increases and of payments for the EBF herein, more closely resemble irreparable injury than does a constitutional violation suffered in the past remediable only by monetary damages. *See, Five Borough Bicycle Club v. City of New York*, 483 F.Supp.2d 351, 361 (S.D.N.Y.2007).

**2.     Plaintiffs' limited relief in this federal proceeding requires injunctive relief.**

Defendants argue that since plaintiffs have "alleged availability of [forms] damages" the Court can award, they have conceded there is a remedy at law that precludes injunctive relief. (Defendant's Memorandum of Law in Opposition at p. 35). This is a misstatement of plaintiffs' position and, more importantly, an assertion that is contrary to law. The Eleventh Amendment is undisputedly a bar to the recovery of full damages in this federal proceeding.

In *Condell v. Bress*, 983 F.2d 415, 420 (2d Cir. 1993), the Second Circuit indicated that monies improperly withheld can only be awarded if they are ancillary to the issuance of preliminary relief. In other words, any award of money is only possible if it is ancillary to the issuance of a preliminary injunction – not a separate remedy. Thus, plaintiffs have no opportunity to obtain lost salary and benefits in this proceeding and can only preserve the contractual rights through an injunction because plaintiffs cannot sue the State or the Governor for damages in

20

federal court.  *Haley v. Pataki*, 883 F.Supp. 816, 821 (N.D.N.Y. 1995), citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984).

Consequently, the court in *Haley* found that irreparable injury arose where a temporary loss of earnings cannot later be remedied because of an Eleventh Amendment bar. *Id*. at 824.  The court added that this was true regardless whether state remedies existed. *Id.  See also, Blum v. Schlegel*, 830 F.Supp. 712, (W.D.N.Y. 1993), citing, *United States v. New York*, 708 F.2d 92 (2d Cir. 1983); *Pankos Diner Corp. v. Nassau County Legislature*, 321 F.Supp. 2d 520 (E.D.N.Y. 2003) (even where facially the injury alleged is monetary, the court may properly find the threatened injury irreparable if, some form of immunity renders movant unable to collect such a judgment); *American Society of Composers v. Pataki*, 930 F.Supp. 873 (S.D.N.Y. 1996).  The same ruling as *Haley* was made in *Association of Community Organizations for Reform Now v. U.S.*, 2010 WL 809960, at *16 (E.D.N.Y. 2010) ("Because the government's sovereign immunity prevents plaintiffs from bringing suit against the [U.S.] government for monetary damages for these injuries, these harms are, by definition, irreparable").  *See also, Alf v. Donley*, 666 F.Supp. 2d 60 (D.D.C. 2009).

In this matter, plaintiffs need a preliminary injunction because, absent such relief, plaintiffs will likely be unable to recover their lost, past contractual benefits in this federal proceeding.

**3.      The irreversible impact of the injuries requires injunctive relief.**

The harm faced by CSEA-represented employees is severe and irreversible.  Tens of thousands of employees covered under the agreements will have their pay slashed by at least 20% per week for an indefinite period because of the furloughs.  Defendants' failure to pay the 4% salary increase creates an additional, indefinite and substantial monetary loss for approximately 68,300 persons.  As more than half of CSEA-represented State workers earn less than $45,000 per

year, with over 14,000 members earning less than $30,000 annually, the loss of a 4% increase in wages is significant.  Unquestionably, CSEA-represented employees and their families and dependants will suffer real hardship.

As for the EBF, CSEA has submitted specific evidentiary proof that defendants' failure to fund the EBF will force benefit suspensions by July 1, 2010, eliminating dental and vision coverage of 208,000 persons.  In response, defendants blandly state that CSEA "presumes, in such filings, that (a) no payments will be made by that date; and (b) that the temporary withholding of payments will result in immediate cessation of benefits" (Megna Affidavit ¶110).  Defendants offer no actual date when payment can be expected and do not factually dispute the EBF Director's specific statements as to the EBF ability to continue to offer services without funds.  In fact, various EBF services are *already* being cancelled or curtailed; specific damage to the EBF program and long-established system of providers is *already* occurring (Howard Reply Affidavit).

The cases defendants cite in support of their position that plaintiffs will not suffer irreparable harm are inapplicable and involve individual probationary employees, employees with expired employment contracts, and private sector cases not involving constitutional issues: *Sampson v. Murray*, 415 U.S. 61 (1974) (wrongful discharge claim by an individual probationary employee); *Jayaraj v. Scappini*, 66 F.3d 36 (2d. Cir. 1995) (city personnel director whose employment contract expired); *Cooper v. TWA Airlines, Inc.*, 274 F.Supp.2d 231 (E.D.N.Y. 2003) (private sector furloughed flight attendants who could, unlike CSEA-represented employees here, receive unemployment benefits); *Williams v. State Univ. of N.Y.*, 635 F.Supp. 1243 (E.D.N.Y. 1986) (individual employee unable to show destitution, i.e. homelessness or bankruptcy).

Specifically regarding the EBF, plaintiffs have provided detailed proof that providers have refused to perform services for CSEA members and their covered dependents due to the uncertainty

of payment for services caused by the State's public refusal to make its required contractual payments. The case cited by defendants, *Building Service 32B-J Pension Fund v. Vanderveer Estates Holding, LLC.*, 115 F.Supp.2d 459 (S.D.N.Y. 2000), actually supports plaintiffs showing of irreparable harm.

Collectively or singularly, the financial impact of defendants' actions with respect to CSEA-represented employees, their families and their dependants will be immense. For thousands of real persons and families, these are things that cannot simply be "remedied" after the fact. *See, Association of Surrogates (Surrogates I),* 940 F.2d 766, 772 (2d Cir. 1991).

Nor should the deleterious effect of defendants' actions on the economy and communities throughout New York State be disregarded. Wage and benefit cuts to tens of thousands of employees obviously will have a rippling effect on businesses and persons throughout New York. As one judge said in ruling on the propriety of preliminarily enjoining layoffs where the State had failed to give proper statutory notice:

> Respondents maintain that the harm, if any, to employees and regional community is not irreparable, but compensable. Such argument fails to recognize the damage inflicted in dollars and cents and the absence of such notice constitutes irreparable harm. Time lost to minimize the impact is irreplaceable. The interruption of salary payments to laid off or discharged employees of Harlem Valley will undoubtedly affect the local economy of the Town of Dover and cause families to fail, even temporarily, to meet payment obligations.

*Town of Dover v. Surles,* (Albany Supreme, 1993), *quoted* in *Grant v. NYS OMH*, 169 Misc. 896, 901 (Kings Supreme, 1996).

**4.      The requested relief is appropriate and narrowly tailored.**

The relief requested herein is precisely the type of narrowly crafted relief deemed appropriate in similar circumstances. *See Haley v. Pataki*, 883 F.Supp. 816, 828 (N.D.N.Y. 1995). Notably defendants do not try to distinguish *Haley*; they do not even mention it.

Contrary to defendants' arguments, the Court did not order the appropriation of funds to pay the collectively negotiated 4% salary increases in addition to enjoining the furloughs. (Defendants' Memorandum of Law, pp. 41-42).  Rather, the Court directed that, if the Governor proposes new extender bills, they be lawful and constitutional.  The fact that such lawful extender bills might require the expenditure of public funds is merely an ancillary result and is, therefore, proper. *Haley* at 822 ("The ancillary effect on the state coffers which would be the result of a forward looking preliminary injunction is not a bar to the relief sought"); *see also*, *Association of Surrogates (Surrogates I)*, 940 F.2d 766, 774 (2d Cir. 1991).

Further, to the extent that defendants complain this Court's Order did not merely preserve the status quo, the Order was nevertheless appropriate under the circumstances.  In the absence of a preliminary injunction, as discussed above, plaintiffs will be unable to obtain complete relief from this Court at the close of the proceedings because an award of retroactive monetary relief against a State for Constitutional violations is prohibited by the Eleventh Amendment.  *Haley* at 821; *see also*, *Frew v. Hawkins*, 540 U.S. 431, 437 (2004); *Edelman v. Jordan*, 415 U.S. 651, 668 (1974); *Kostok v. Thomas*, 105 F.3d 65, 69 (2d Cir. 1997).

## CONCLUSION

By reason of the foregoing, it is respectfully requested that plaintiffs' application for a preliminary injunction be granted; that defendants be preliminarily enjoined from implementing any furloughs of CSEA bargaining unit members; that defendant DAVID A. PATERSON, as

Governor of the State of New York, be preliminarily enjoined from submitting to defendants NEW

YORK STATE ASSEMBLY and NEW YORK STATE SENATE any further "extender"

appropriation bills that do not include appropriations in the amount and at the rates provided for in

the collective bargaining agreements between the parties for the CSEA Employee Benefit Fund and

for the CSEA bargaining unit members at the applicable salary rates provided therein; and that the

Court grant such other and further relief as deemed just and proper.

Dated: May 25, 2010
    Albany, New York

                        Respectfully submitted,

                        NANCY E. HOFFMAN

By:    */s/ Timothy Connick*
        Timothy Connick, of counsel
        Bar Roll No. 506163
        143 Washington Avenue
        Albany, New York 12224
        Tel.: (518) 257-1443
        Fax: (518) 449-1525
        tim.connick@cseainc.org

Timothy Connick,
Steven A. Crain,
Miguel Ortiz,
Paul S. Bamberger,
Daren J. Rylewicz,
Leslie C. Perrin,
Eric E. Wilke,
Kara L. Hilburger,
    On the Brief

PL/10-0645/TC/ks/Reply MOL//#147496